George W. STURM, doing business as George W. Sturm Associates

v.

The UNITED STATES.

No. 274–68.

United States Court of Claims.

Feb. 20, 1970.

Alan Raywid, Washington, D. C., attorney of record, for plaintiff; Cole, Zylstra & Raywid, Washington, D. C., of counsel.

J. Laurence Heizmann, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant. Russell W. Koskinen, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This is a little case in which, once again, the Government's contract suffers from the endemic disease of ambiguity and imprecision. The remedy, once again, is the conventional one taken from the standard legal pharmacopeia. In July 1963, George W. Sturm entered into a cost-plus-fixed-fee contract with the Maritime Administration to conduct a study on the feasibility of using plastic membranes in double-bottom tanks for ocean-going vessels. The agreement called for completion no later than six months after signing—this would bring it to January 3, 1964—and established a limitation on expenses. This rigid ceiling was, however, made somewhat flexible by a provision, now in dispute, permitting exclusion of "all indirect expense incurred on the basis of final overhead rates * * *" Originally, defendant was to pay Sturm a total of $12,250, comprised of work expenses of $11,449 and a fixed fee of $801. A memorandum, incorporated in the contract, set Sturm's own direct labor charge at $150 a day, or $18.75 per hour. The contract also provided that if the contractor believed that his costs would exceed 75% of the estimated cost, during the life of the contract, he had to give 60 days written notice and a revised estimate to the Administration. The Government would not be obligated to pay such additional costs, nor would Sturm be required to continue work, in the absence of the agency's written approval of the increase.

Early in performance, a Government accountant, attempting to calculate the anticipated overhead, concluded that various factors (irrelevant to this suit) complicated this computation to the point of rendering current overhead estimates impossible. Consequently, for some months Sturm's invoices included direct labor costs only. In December 1963, he submitted a voucher covering overhead expenses through November 30th, and advised Maritime that he could not fulfill the contract as to time or price. He requested an extension to April 1, 1964, and a price increase of $4,000. The defendant agreed to the extension, and authorized an increase of $2,500, from $12,250 to $14,750, despite the contractor's failure to give 60 days' written notice. Even after this change became effective, the total current cost —$11,378 ($9,007.40 direct expenses and $2,370.64 indirect and overhead expenses)—exceeded 75% of the revised

estimated cost. However, the Government never complained that Sturm was delinquent with respect to the notice requirement.

The work was finally done, and the contracting officer ultimately testified that all of the costs were reasonable and allowable (putting the maximum limitation aside), that Sturm's efforts were highly competent and valuable, and that defendant benefitted from the contract. But first there was a dispute as to overhead expenses. Defendant refused to pay certain billings, maintaining that the $150 direct labor charge included overhead. Plaintiff argued that overhead was independent of the labor expense. The issue was ultimately resolved by Maritime in plaintiff's favor.

In March 1964, Sturm submitted his last invoice prior to completion. It listed direct costs of $10,944.17, indirect costs of $2,670.57, and a fixed fee of $801, for a total of $14,415.74—which was a bit less than the then cost limitation of $14,750. But later, after completion, plaintiff presented a final invoice totalling $17,105.11:

| | |
|---|---:|
| Direct Labor: | $13,042.83 |
| Other Direct Charges: | 488.40 |
| | $13,531.23 |
| Fee: | 801.00 |
| | $14,332.23 |
| Overhead: | 2,772.88 |
| Total: | $17,105.11 |

Defendant paid $14,750, but refused the balance of $2,355.11 on the ground that it constituted an unauthorized overrun, and was therefore not payable under the cost-limitation clause, Article 4 of the General Provisions ["General Article 4"]. Sturm appealed under the Disputes clause to the Maritime Administrator (the "head of the department"). The Hearing Examiner advised the Maritime Administrator that, on two grounds, plaintiff should receive the full amount. The examiner first held that there was no overrun, since overhead was not included in the total cost limitation by virtue of Article 4 of the Special Provisions, ["Special Article 4"], and the direct costs were less than the total estimate. In the alternative, he felt that, even if there was an over-run, the special circumstances—including the quality of plaintiff's performance, the admitted benefit to defendant, the erroneous insistence that plaintiff's daily charge included overhead, the lax approach to the contract requirements taken by both parties, and the impossibility of giving the contractual 60 days' notice of the over-run—demanded that there be full payment to Sturm. The contracting officer appealed, in turn, to the Acting Maritime Administrator, who reversed the examiner. The contractor now brings the case here, and both sides have appropriately moved for summary judgment.

The controversy centers on the interaction of General Article 4 with Special Article 4.[1] It is plaintiff's position that

---

1. [General Provisions]
   ARTICLE 4. *Limitation of Cost.* (a) It is estimated that the total cost to the Government, exclusive of any fixed fee, for the performance of this contract will not exceed the estimated cost set forth in the Special Provisions, and the Contractor agrees to use its best efforts to perform the work specified in the Special Provisions, and all obligations under this contract within such estimated cost. If at any time the Contractor has reason to believe that the costs which it expects to incur in the performance of this contract in the next succeeding sixty (60) days, when added to all costs previously

he is entitled to all overhead costs, regardless of the expense ceiling fixed under General Article 4, since the special clause expressly excludes overhead from the limitation. On this interpretation, the direct costs, including the fixed fee, amounted to $14,332.23, well within the cost limitation. Defendant, on the other hand, urges that the purpose of the special provision is simply to enable the contractor to recover any increase between the estimated "billing" overhead and the final, actual overhead charges, and was inserted in view of the difficulty of accurately computing this cost factor in advance of or in the course of performance. Thus, defendant would allow, presumably, the difference between the $2,670.57 overhead charge in plaintiff's March invoice, and the $2,772.88 figure for the same item in the final September billing.[2] Other than this $102.31 difference, defendant would deny all recovery since the combined direct and indirect costs exceed the new contract limit of $14,750.

■■ The first paragraph of Special Article 4 begins by what appears to be an unqualified exclusion from the coverage of General Article 4—"Notwithstanding the provisions of Article 4 of the General Provisions." It then goes on to declare that the contractor is to be reimbursed "*for all* indirect expense incurred hereunder on the basis of final overhead rates" (emphasis added). This language may have actually been intended by the draftsman to provide for recovery (over and above the ceiling) only of the difference between the initially estimated overhead and the final actual overhead. But the phrasing does not say so explicitly—if it says that at all, it is, at best, very unclear—and it would be entirely reasonable for the contractor to believe, as Sturm indicates he did, that overhead was wholly carved out from the cost limitation. The special article tells him, on its face, that, regardless of General Article 4, he can recover "all" his indirect expenses (obviously including overhead) on the basis of the overhead rates finally established.

incurred, will exceed seventy-five percent (75%) of the estimated cost then set forth in the Special Provisions, or if at any time, the Contractor has reason to believe that the total cost to the Government, exclusive of any fixed fee, for the performance of this contract will be substantially greater or less than the then estimated cost thereof, the Contractor shall notify the Administration in writing to that effect, giving the revised estimate of such total cost for the performance of this contract.

(b) The Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the estimated cost set forth in the Special Provisions, and the Contractor shall not be obligated to continue performance under the contract or to incur costs in excess of the estimated cost set forth in the Special Provisions, unless and until the Administration shall have notified the Contractor in writing that such estimated cost has been increased and shall have specified in such notice a revised estimated cost which shall thereupon constitute the estimated cost of performance of this contract. When and to the extent that the estimated cost set forth in the

Special Provisions has been increased, any costs incurred by the Contractor in excess of such estimated cost prior to the increase in estimated cost shall be allowable to the same extent as if such costs have been incurred after such increase in estimated cost.

[Special Provisions]

ARTICLE 4. *Overhead Rates.* (a) Notwithstanding the provisions of Article 4 of the General Provisions, the Contractor shall be reimbursed for all indirect expense incurred hereunder on the basis of final overhead rates and for the applicable overhead periods determined by the Administration for application to the performance of this contract.

(b) Pending establishment of final overhead rates for each such overhead period, the Contractor shall be reimbursed at such billing rates as may be agreed upon by the Contractor and the Administration for application to this contract, subject to appropriate adjustment when final rates have been established for such period.

2. This possibility has not been discussed by either party, but it is implicit in defendant's interpretation of Article 4 of the Special Provisions.

That is precisely what plaintiff is seeking from the Government—his overhead on the basis of the final overhead rates.

Not only would the literal wording of Special Article 4 tend to support this reading, but it would be easy to believe that the Government was willing to exclude overhead (and other indirect) expense from the maximum because, unlike direct costs, overhead is relatively immune from deliberate escalation by the contractor. The agency could well think that, if it controlled direct costs via the ceiling limitation, it did not have to worry much about overhead and indirect expense; those elements would automatically take care of themselves. Reinforcing this view, and strengthening the reasonableness of the contractor's position, is the difficulty of fitting the 60-day notice requirement of General Article 4 to the problem of overhead which, as Sturm's experience proved, is hard to calculate during the early stages of performance; this could be believed to be a further reason for excluding overhead from the general cost limitation.

We do not say that the Government officials who drew up these two articles subjectively desired to remove overhead from the cost ceiling—but, of course, that is not the test. The test is whether the contractor, who realistically had to acquiesce in the Government's proffered form, could reasonably construe it that way. Sun Shipbuilding & Dry Dock Co. v. United States, 393 F.2d 807, 816, 183 Ct.Cl. 358, 372–373 (1968); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6 (1963); Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947). This oft-repeated and much-applied rule serves important purposes. It puts the risk of ambiguity, lack of clarity, and absence of proper warning on the drafting party which could have forestalled the controversy; it pushes the drafters toward improving contractual forms; and it saves contractors from hidden traps not of their own making.

Defendant contends, but not persuasively, that in this instance plaintiff's interpretation is unreasonable. To read the overhead clause as plaintiff desires, it is said, would be in effect to limit "total cost" in Article 4 of the General Provisions to mean "direct costs". This, the Government believes, would contradict the definition of "total cost" set out in Section XV, part 2 of the Armed Services Procurement Regulations, incorporated in this contract by reference (Article 5a of the General Provisions). Section XV, part 2, of ASPR defines total cost as including all direct and indirect costs. But it is plain that, if the defendant had actually wished to exclude overhead from the reach of General Article 4, it could have done so without contravening the ASPR provision, and, indeed, could have used the very wording it chose for Special Article 4 to make the exception. Defendant also cites a number of cases in which a board of contract appeals refused to exclude overhead entirely from a cost ceiling. See, e. g., ITT-Kellogg Division, 65–1 BCA ¶ 4635 (1965); Pickard & Burns Electronics, 68–2 BCA ¶ 7149 (1968); Dunlap & Associates, Inc., 66–1 BCA ¶ 5487 (1966). Unlike the broad scope of Article 4, Special Provisions, however, the pertinent clauses in those cases were precise and restrictive, describing explicitly the method of determining the amount excludable from the cost limitation provision. Thus, the board decisions tell us, at most, that we must look to the precise language employed in the contract, which in this case clearly embraces plaintiff's interpretation within its sweep.

We hold, therefore, that for plaintiff Special Provisions, Article 4, must be read as excluding final overhead expenses from the total cost limitation of Article 4 of the General Provisions. He is entitled to recover his full expenses and fee. His motion for summary judgment is accordingly granted, and the defendant's cross-motion is denied. As $14,750 has already been paid by the Government, judgment is entered for plaintiff in the amount of $2,355.11.