**SINGER–GENERAL PRECISION, INC.**

v.

**The UNITED STATES.**

**No. 92–69.**

United States Court of Claims.

June 12, 1970.

Joseph Sachter, Scarsdale, N. Y., for plaintiff; Theodore E. Gladstone, New York City, attorney of record. Theodore H. Lassagne, Los Angeles, Cal. and Alvin A. Simon, Bronx, New York, of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DE-
FENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT

DAVIS, Judge.

By the Spring of 1963, the Navy had been trying since 1960 to formulate a development program for the EX–10 Torpedo Weapons System. In that period of some three years, plaintiff Singer-General Precision (Singer), through its predecessor, had prepared, at the Navy's request, three proposals relating to this development program, including work statements for various studies, and for technical and managerial services. None

of this work concerned actual production of any item of munitions; it all dealt with proposals and studies looking toward eventual procurement and production of the hardware. In each of these instances, Singer charged indirect proposal preparation costs to its general overhead expense account, allocating them, as part of the general overhead, to other Government contracts. This procedure accorded with the Armed Services Procurement Regulations (AS PR 15–205)[1], no objections were raised by the Navy, and plaintiff reimbursed itself in the prescribed manner through awards on other agreements with defendant.

In mid-1963, the Government, seeking to "refine, expand and elaborate" upon these EX–10 proposals, presented Singer with a "work statement" consisting of 37 tasks and a separate, comprehensive "report" (so labelled in the work statement) summarizing the rest of the assignment (Task 38), and asked plaintiff to submit a cost estimate for the project. Singer replied that expenses would be about $327,000. This figure was not contested, but the Government informed the potential contractor that it had only $500,000 available for this project, half of which would go to another contractor and half to Singer, and it offered what it called a new, experimental "cost-no-free project definition phase" type contract. This was substantially identical, in subject matter and wording, to the work statement, except that in Task 38 (the final one), the word "report" was, in every instance, changed to "proposal".[2] The contract also included a "cost ceiling" clause, establishing a $250,000 maximum price, and a "cost limitations" clause requiring 60 days' notice to the Government if the contractor believed expenses would exceed 75% of the total cost. The latter provision also stated that when the cost ceiling was reached, the contractor could terminate without liability.[3] No explanation for the repeated change in Task 38 of the word "report" to "proposal" was given. Singer accepted the Government's offer without indicating that it understood the contract to mean that indirect costs incurred in preparing the proposal would be reimbursed in the manner envisaged by ASPR 15–205.3, *supra,* through other

---

1. ASPR 15–205.3 states:

 "Bidding costs are the costs of preparing or proposals on potential Government and non-Government contracts or projects, including the development of engineering data and cost data necessary to support the contractor's bids or proposals. Bidding costs of the current accounting period of both successful and unsuccessful bids and proposals normally will be treated as allowable indirect costs * * *

2. "Report" was changed to "proposal" six times in the 12 lines of Task 38, including the heading.

3. The relevant provisions are:

 "Section E—Cost Ceiling
 "It is hereby agreed by and between the parties hereto that the cost for the performance of this contract shall not exceed the sum of $250,000.00, and the Government shall not be obligated to pay to the Contractor any costs in excess of said sum of $250,000.00 incurred by the Contractor in the performance of this contract.
 "*General Provisions:*
 \* \* \* \* \* \*

"3. Limitation of Cost
"(a) * * * If at any time the Contractor has reason to believe that the costs which it expects to incur in the performance of this contract in the next succeeding sixty (60) days, when added to all costs previously incurred, will exceed seventy-five percent (75%) of the estimated cost then set forth in the Schedule, or if at any time, the Contractor has reason to believe that the total cost to the Government, exclusive of any fixed fee, for the performance of this contract will be substantially greater or less than the then estimated cost thereof, the Contractor shall notify the Contracting Officer in writing to that effect, giving the revised estimate of such total cost for the performance of this contract.
"(b) The Government shall not be obligated to reimburse the Contractor for costs incured in excess of the estimated cost set forth in the Schedule, and the Contractor shall not be obligated to continue performance under the contract or to incur costs in excess of the estimated cost set forth in the Schedule * * * *"

Government contracts. Similarly, the Navy did not intimate that it considered the limitation of $250,000 to cover indirect costs chargeable to other contracts, as well as direct costs allocable to this agreement. The contract (No. NOw-63-0748-c), with a performance period of 95 days, became effective on June 28, 1963.

During the next few weeks, Singer, through its own budget meetings and inter-office memoranda, determined internally that Tasks 1-13 and 38, constituting what it called the "technical effort", would incur around $250,000 in direct costs and Tasks 14-37, the "proposal preparation effort" would require $75,000 to $100,000 in indirect overhead expenses. It so informed the Government and proceeded to divide the work into two jobs for accounting purposes. Tasks 1-13 and 38 were reported under a job number indicating that they were "direct cost items" and Tasks 14-37 under another designation indicating them as "indirect overhead proposal expense item". Separate records were maintained, and this separation was known to the Government's two resident auditors.

After the contract was timely completed, Singer submitted its costs, noting $263,073.65 as direct expenses, and $156,639.00 as indirect overhead charges, which it considered to be allocable to other contracts, as it had done with its prior work on this program since 1960. The contracting officer paid $250,000 under this contract and plaintiff did not ask for any more.[4] However, it treated the $156,639 of "indirect" costs as part of its general overhead and, as such, allocable to all Government contracts being performed by plaintiff during the accounting period within which these costs

were incurred. There were six such contracts (other than No. NOw-63-0748-c). Some time later, the Defense Contract Audit Agency disallowed the allocations to these other contracts, holding that the Cost Ceiling clause in the EX-10 contract (No. NOw-63-0748-c) forbade the recovery of any excess over $250,000, even through overhead allocations to other contemporaneous contracts. On appeals under these six other contracts, the ASBCA affirmed. This suit was then brought to recover under the six other agreements to which the disallowances were directed. It is agreed, though, that the EX-10 contract controls the result and that we need not be concerned with the terms of the other documents. The issue under the EX-10 contract is one of law,[5] there are no relevant factual disputes, and we have before us cross-motions for summary judgment on the administrative record which was almost entirely stipulated.

Routinely, one looks first to the contractual language for dispositive or near-dispositive guidance. It tells us (note 3, *supra*) that "the cost for the performance of this contract shall not exceed the sum of $250,000, and the Government shall not be obligated to pay to the Contractor any costs in excess of said sum of $250,000 incurred by the Contractor in the performance of this contract." This clause, the defendant maintains, necessarily established a maximum fixed price for all work described by the contract, and the Navy was not to be charged, in any manner, for any excess.[6] Stressing the references to "this contract", plaintiff argues that indirect costs pertaining to bid and proposal efforts may be recovered, through allocation to the general overhead account, under other government procurements, and

4. Plaintiff does not now seek reimbursement of the excess $13,073.65 in direct costs, and has never sought reimbursement for that sum.

5. See, *e. g.*, Paccon, Inc. v. United States, 399 F.2d 162, 169, 185 Ct.Cl. 24, 35 (1968); Dynamics Corp. of America v. United States, 389 F.2d 424, 429, 182 Ct.

Cl. 62, 71-72 (1968); W. G. Cornell Co. v. United States, 376 F.2d 299, 308, 179 Ct.Cl. 651, 664-665 (1967).

6. There was a provision by which this ceiling could be administratively raised, but plaintiff never sought relief under that part of the contract.

that the $250,000 ceiling pertains only to reimbursement under the EX–10 contract itself.

In some agreements, the bare wording may be so clear, so detailed, and so explicit that it must carry the day, whatever else is offered to help in interpretation. But here, it seems to us, the unadorned language of the clause is not so demanding that, without more, it forces the defendant's construction, regardless of the surrounding conditions and of the other factors. Especially in the light of the nature of this contract—to prepare a proposal for future procurement—it is possible to read the relatively few words of the provision as saying no more than that $250,000 is the most that will be paid under the EX–10 contract itself. In the proper circumstances, that would not distort the language beyond toleration. The central problems, rather, are whether Singer did in fact so read the clause, and whether that interpretation was right or reasonable in all the surrounding circumstances. See *e. g.* United States v. Lennox Metal Mfg. Co., 225 F. 2d 302, 310–315 (C.A.2, 1955) (opinion of Judge Frank).

In answering these questions, it helps, first of all, to reconstruct the plaintiff's actual attitude, as it appears from the record. Singer had done three earlier proposals for the Government on the EX–10 Torpedo project, and had, without objection, charged such proposal preparation expenses to its general overhead account, which, in turn, was allocated to other contracts. This practice accorded with the provisions of ASPR 15–205.3, *supra,* which permitted such treatment of costs incurred in preparing bids and proposals. When the new and fourth project came up for discussion in 1963, in the form of the Government's "work statement", plaintiff calculated that it would surely cost over $320,000, and it so told the Navy. The latter did not argue with this figure but informed plaintiff that there was only $250,000 to allot to this particular project. Plaintiff would not take a fixed-price agreement, and the defendant offered a cost-reimburs-

able no-fee contract. When the final agreement was presented by the Government, it embodied a cost ceiling of $250,-000, but Singer noted, too, that in Task 38, the "Final Detailed Proposal", the word "report", as it had appeared in the initial work statement, was six times, altered to "proposal" (including a change in the heading from "Final Report" to "Final Detailed Proposal"). We think that the record shows conclusively that plaintiff then assumed—whether it was justified or reasonable in doing so we discuss later—that the 1960–1962 practice could continue under the new contract and therefore that it could allocate much of the work under that project as indirect costs includable in overhead and attributable to other current federal activities. In performing the contract, plaintiff consistently followed this assumption, which was in no way hidden from the Government's auditors. As we have pointed out, it considered the contract work easily divisable into "direct" expenses (the "technical effort") and "indirect" costs ("the proposal preparation effort"), and it kept its records on that basis. When the contract was done, plaintiff contented itself with reimbursement under the contract of $250,000, although its books showed that it had spent some $13,000 more in direct costs which it attributed to this contract alone. The remaining expenses of work on the EX–10 project it sought to allocate, via the overhead account, to other projects, just as it had done in the past. From all this (as well as other aspects of the record), it cannot be gainsaid that plaintiff has, all along, taken, in its own corporate mind, the same legal position it now asserts before us. There has been no change on its part, nor is there any suggestion that it had any serious internal doubts as to the correctness of its course.

 Did plaintiff act reasonably and justifiably in making this assumption? Several factors combine to yield an affirmative response. First *is* the pre-1963 history, which we need not repeat. That pointed squarely to the pro-

priety of distributing those expenses, which could readily be characterized as bid and proposal costs, to all current government contract work, by means of the general overhead account.[7] "This experience, under somewhat similar contracts, may be considered in determining the reasonableness of plaintiff's interpretation of the contract documents." D & L Constr. Co. & Associates v. United States, 402 F.2d 990, 994, 185 Ct.Cl. 736, 743–744 (1968).

Second is the Navy's otherwise inexplicable substitution—after the discussions revealing that the $250,000 limit would be far exceeded—of the word "proposal" in Task 38 of the final contract for "report", which had appeared in the original work statement. Defendant can surmise only that this change, which was so significant to plaintiff, was to describe more accurately the work involved. Plaintiff reasonably insists that it understood the change was effected for the purpose of bringing indirect proposal costs involved in this contract within the umbrella of ASPR 15–205.3, as had been the prior practice—that the aim of the change was to enable the contractor to escape, to the extent of indirect expenses, the limitation of costs under the EX–10 contract itself. Added to this was the facility of dividing this contract into "direct" costs and "indirect" bid and proposal expenses— as plaintiff immediately undertook to do on its books.

Next, there is the cardinal fact that both Singer and the Navy knew, before the contract was made, that at least some $327,000 would be spent on the project, if it was to be performed properly, while the Government had only $250,000 to set aside directly for the contract. With this knowledge, plaintiff would not accept a fixed price contract (which could not have exceeded the $250,000) and the

Navy did not insist on one. Instead, a no-fee cost-type contract was agreed upon. In the absence of a fee, there would, of course, be no possibility of recouping any of the expenditures through the profit on this contract. It is said, however, that Singer was expected to recoup the excess costs from the potential profits on future procurement of the EX–10 item or out of *profits* on unrelated Government or other contracts.[8] There are good reasons (in addition to the pre-1963 practice, the change from "report" to "proposal", and the defendant's failure to insist on a fixed-price contract) why the contractor could reasonably reject this harsh interpretation of its situation. Plaintiff had no assurance that a production contract for the EX–10 would be offered, or, if the procurement was eventually made, that Singer would obtain it; a rival contractor was already in the arena doing the same preparatory work. Thus, the risk of losing the entire excess over $250,000 was not unsubstantial. Moreover, there is a strong Defense Department policy against "buying in" (ASPR 1–311; see Cutler-Hammer, Inc. v. United States, 416 F.2d 1306, 1312, 1318, 189 Ct.Cl. 76, 86–87, 95–96 (Oct. 1969)), and Singer could properly assume that the Government did not want or expect it to indulge in that practice.

Again, if excess costs over $250,000 could be recovered only through future *profits,* plaintiff had (and doubtless knew that it had) a viable and preferable alternative. It could refuse to take the preparatory contract but proceed on its own initiative with the work nevertheless, in anticipation of bidding on the production contract—and then charge all the expense of the preparatory work to overhead under ASPR 15–205.3, *supra.* Under the rule that the Government must consider and evaluate all proposals

---

7. Plaintiff dealt in the same way with the expenses of preparing its preliminary computation, in the Spring of 1963, that the new "proposal" contract would cost at least $327,000. The defendant's auditors allowed this treatment.

8. Plaintiff expected to recoup out of the *costs* of unrelated Government and other procurement.

bearing on a new procurement, the Navy would have been required, in that situation, to consider Singer's bid on the follow-up production contract even though it had refused the preparatory contract. Plaintiff would therefore not be excluded from seeking to be the contractor for the production phase, and at the same time it would be able to charge off *all* the expenses of the preparatory work to the cost of its other federal activities.

Still another element justifying Singer's understanding of the coverage of the cost limitation clauses is the unreality of those provisions, as applied to this contract, if the defendant is correct. The Government insists that plaintiff was required to give 60 days' notice upon belief that expenses would reach 75% of the total cost, and, furthermore, that when the cost ceiling of $250,000 was attained, plaintiff could terminate without liability. These provisions, standard-form requirements in Government cost-type contracts, are absurd in the context of this particular project. The performance date fell due 95 days after the agreement became effective. Both parties knew that total estimated costs were about $327,000; thus, 75% of the $250,000 limit would be reached after about 46 days. To meet the notice requirement, plaintiff would therefore have had to inform defendant in writing of this fact fourteen days before the contract became effective. As for the "quit" clause, it, too, does not make sense in this situation. Defendant knew, before the contract was signed, that total costs would exceed $250,000.[9] To accept the position that plaintiff could have, and should have, terminated upon reaching that limit would mean that the Government entered into a quarter-of-a-million dollar contract, knowing it could well receive practically nothing in return, since, as it has conceded, the value of the

agreement rested almost entirely upon completion of the last part, Task 38.

In the same vein, it is significant, as we have already suggested, that the Government used a "no-fee" contract in what it described as a new form of procurement. The defendant, both before the Board and at oral argument, readily acknowledged that the "cost-no-fee project definition phase" type arrangement, "specifically Contract NOw–63–0748–c, was a new concept in contracting." (ASBCA Transcript, pp. 13–14.) The general rule with respect to a "no-fee" contract, unless it is clearly negatived, is that the Government assumes the risk of expenses beyond the estimated price which are not due to unreasonable conduct by the contractor. Wyman-Gordon Co., 59–2 BCA ¶ 2344, ASBCA No. 5100. And the "new concept"—that "the Government as part of a contractual effort would require a contractor to submit a proposal"—could easily and reasonably be taken to mean that the contractor would be paid, one way or another, for his efforts.[10]

Finally, in assessing plaintiff's reasonableness, we note that, without objection or question from the resident auditors (maintained by defendant to survey plaintiff's accounting procedures on Government contracts), Singer kept separate accounts for direct and indirect charges, and even assigned two different job numbers to the "divided" Contract NOw–63–0748–c, to insure proper maintenance of the records. This silence of the auditors during performance could justifiably be taken by plaintiff to mean that accounting treatment on this contract was not to differ from the past proposal-type efforts, and recovery of indirect expenses would be handled in similar fashion.

■■ These are the several factors which, taken together, ratify and justify

---

9. All that plaintiff bound itself to do was "to use its best efforts to perform the work" within the limitation of $250,000.

10. When the concept of "contract definition" was later formalized, the Defense Department appears to have emphasized that the contractor be fully compensated for his work on this aspect. See Department of Defense Directive 3200.9 (Feb. 1964).

plaintiff's understanding. What about the Government's side? It is far from clear that the defendant's representatives had any different view at the time the contract was made and was being performed. Many of the elements we have considered suggest, some quite strongly, that the Navy itself affirmatively intended Singer to be able to recoup the excess in the same way as it had done before. If this is so, then plaintiff's interpretation is not only reasonable, it is undoubtedly right. But even if the defendant's men actually harbored in 1963, within themselves, the position now taken by the Government in litigation, the result must be the same. We need not expound, once more, that the unexpressed, subjective, unilateral intent of one party is insufficient to bind the other (Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75 (1960)), especially when the latter reasonably believes otherwise. WPC Enterprises, Inc. v. United States, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6 (1963); Sturm v. United States, 421 F.2d 723, 727, 190 Ct.Cl. 691, 697 (1970). It is the objective manifestations which count. See, e. g., Padbloc Co. v. United States, 161 Ct.Cl. 369, 377–379 (1963); Globe Steel Abrasive Co. v. National Metal Abrasive Co., 101 F.2d 489, 491–492 (C.A.6, 1939). A very strong argument can be made that, in the objective circumstances, Singer was not only reasonable but right in its view that most of the excess could be charged to other work. But we need not go that far. The Government, as we are called upon to repeat so often, bears the full burden and the risk when it leaves its contract open to more than one reasonable construction. See Morrison-Knudsen Co. v. United States, Ct.Cl., 427 F.2d 1181, decided this day, and cases cited.[11]

Perhaps the most striking aspect of the contractual history in this case is the apparent lack of free and open communication between the parties. It may be that, at the time, things seemed clearer than they were later made to appear. It may also be, on the other hand, that each side was playing its cards close to the chest. On this record it is impossible to tell for certain. In any event, having decided that, in the external circumstances, plaintiff was wholly reasonable in its interpretation of the cost limitation, we cannot fault it for not making inquiry before it signed the agreement. There was no glaring, patent, or drastic discrepancy, omission or ambiguity on the face of the contract—and there is no indication that plaintiff thought there was such a gap needing resolution. See Mountain Home Contractors v. United States, 425 F.2d 1260, 192 Ct.Cl. —— (May 1970). To Singer, acting reasonably, the entire contract could readily be harmonized with the past practice, the somewhat cryptic signals given by the Navy, and all the enveloping circumstances. The plaintiff evidently thought that it was in agreement with the Navy on how the excess was to be treated.

As for the Government, it was not only the author; it did the various acts (e. g., changing "report" to "proposal", proffering a no-fee cost contract, inserting a $250,000 limitation although it knew that Singer's costs would far out-run that sum, etc.) which induced Singer to believe that the defendant agreed with its stance. It follows that, if there was ambivalence, the doubt was primarily attributable to the Government, and the Government had the obligation to clarify. Its failure to do so leaves it with the liability. WPC Enterprises, Inc. v. United States, 323 F.2d 874, 876–877, 879, 880, 163 Ct.Cl. 1, 6, 10–11, 12 (1963). That principle is more than merely just; it is the only effective prod we can use to reduce the needless imprecision in federal contractual forms. Sturm v. United States, 421 F.2d 723, 727, 190 Ct.Cl. 691, 697 (Feb. 1970).

For these reasons, plaintiff's motion for summary judgment is granted and

---

11. We do not understand the plaintiff as ever having stipulated that Contract No. NOw–63–0748–c is unambiguous in the respects pertinent to our decision.

defendant's cross-motion is denied. Plaintiff is entitled to recover $156,639.-00, and judgment is entered to that effect.