**SOFARELLI ASSOCIATES, INCORPORATED and Sofarelli Associates, Limited**

v.

**The UNITED STATES.**

**No. 384–80C.**

United States Claims Court.

Nov. 18, 1982.

---

Charles R. Allen, Jr., Roanoke, Va., for plaintiffs.

Frank M. Rapoport, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

HOGENSON, Judge:

Plaintiffs Sofarelli Associates, Inc. and Sofarelli Associates, Ltd. (hereinafter referred to jointly and singularly as Sofarelli) bring this action for damages and/or an equitable adjustment under the "CHANGES" clause of a Government construction contract. Sofarelli seeks to recover the extra costs allegedly incurred in running conduit and wire from certain fan coil heating and air conditioning units to remotely mounted fan speed switches on the principal ground that the original contract specifications and drawings were ambiguous. The court finds that Sofarelli was aware of the potential ambiguity in the contract prior to submitting its bid and yet did not properly ensure that appropriate amendments were made to the bid package and is therefore not entitled to recover.

## FACTS

The court finds the following relevant facts:

1. Plaintiff entered into a contract with the United States Department of the Navy on May 9, 1977, to construct bachelor enlisted quarters and a mess hall at the Marine Corps base at Camp Lejeune, North Carolina. The contract identification number was N62470–75–C–5320. It incorporated the bid documents of the invitation for bids for the same project, number N62470–75–B–5320.

2. Section 15654 of the mechanical division of the contract sets forth the air conditioning, heating and ventilating specifications. Interior electrical specifications are set forth in section 16402 of the electrical division. Sections 15654 and 16402 cross reference one another, indicating that certain electrical requirements are contained

in the mechanical section and certain mechanical requirements in the electrical section.

3. The contract drawings are arranged by division, the mechanical drawings shown as M–1a through M–10 and the electrical drawings shown as E–1a through E–12.

4. The contract provides for the installation of fan coil units as the heating and cooling mechanism for the various rooms constructed. The operation of the fan coil units, particularly the thermostatically controlled valves regulating the flow of hot and cold water through the units and the fan blowing air through them, necessitates the connection of controls and electrical power to the units.

5. The contract provisions pertinent to this case are as follows:

A. Subsection 5, captioned "INQUIRIES," of section 00101, entitled "BIDDING INFORMATION," provides:

All questions concerning the bidding or any other phase of the plans and specifications occuring prior to bid opening shall be presented to the Design Division, Atlantic Division, Naval Facilities Engineering Command, Building N–26, Room 307, Naval Station, Norfolk, Virginia 23511, telephone 444–7631, area code 804. Questions requiring interpretation of drawings and specifications must be submitted at least 10 days before bid opening. Interpretations or modifications to specifications made as a result of questions will be made by amendment only, and unless so done, all bidders should base their bids on the plans and specifications as issued.

B. Paragraph 2, captioned "SPECIFICATIONS AND DRAWINGS," of the "GENERAL PROVISIONS," provides in part:

* * * Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned on the specifications, shall be of like effect as if shown or mentioned on both. In case of difference between drawings and specifications, the specifications shall govern. In the case of discrepancy either in the figures, in the draw-

ings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. * * *

C. Subsection 5, captioned "FAN COIL UNITS," of section 15654, entitled "AIR CONDITIONING, HEATING AND VENTILATING" (within the mechanical division), provides in part:

* * * Controls shall be as specified hereinafter and shall be furnished by the temperature control manufacturer for mounting inside the cabinet.

D. Subsection 9, captioned "ELECTRICAL," of section 15654 (within the mechanical division) provides in part:

9.1 Motors and controllers shall be furnished with their respective pieces of equipment; and shall conform to and shall have all electrical connections provided under division entitled "Electrical." * * *

9.2 Electrical work is specified in the division entitled "Electrical," except for control wiring. Control wiring shall be provided under this section and shall conform to NFPA 70. * * *

E. Subsection 4, captioned "GENERAL REQUIREMENTS," of section 16402, entitled "INTERIOR ELECTRICAL SYSTEMS" (within the electrical division), provides in part:

* * * The contract drawings indicate the extent and general arrangement of equipment, fixtures, and conduit and wiring systems. * * *

F. Subsection 7, captioned "INSTALLATION," of section 16402 (within the electrical division) provides in part:

7.9 Disconnect Switches: Disconnect switches shall be provided where indicated.

*　　*　　*　　*　　*　　*

7.11 Motors and Controllers: Motors and controllers furnished under the division entitled "Mechanical" shall be installed under this section. Motors and controllers shall be mounted and wired to operate as indicated.

*　　*　　*　　*　　*　　*

7.16 Equipment Connections: All power wiring for the connection of motors and control equipment as indicated on the electrical drawings shall be provided under this section of the specification. Except as otherwise specifically noted or specified, automatic control wiring, control devices, and protective devices within the control circuitry are not included in this section of the specifications, but shall be provided under SECTION: 15654 Air Conditioning, Heating and Ventilating.

6. The contract drawings pertinent to this case are Nos. M–2 and M–5 of the mechanical drawings and E–1a, E–1b and E–4 of the electrical drawings.

A. Drawing M–2 shows, among other things, the location of thermostats on the walls separating the bathrooms from the sleeping quarters of the various rooms constructed. These are denoted by a "T" inside a circle, although no legend in any part of the drawings explicitly defines the symbol.

B. Drawing M–5, as amended, includes among other diagrams, the fan coil unit control diagram for the bachelor enlisted quarters (BEQ). The diagram depicts control wiring for a fan coil unit fan speed switch with "Off/Hi/Med/Lo" settings. The caption to the diagram states in part "t' stat & fan switch shall be mounted on separate wall plates adjacent to each other." The diagram did not otherwise locate the position in the BEQ rooms of the fan switch or the thermostat.

C. Drawing E–1a and E–1b contain legends indicating that the fan coil units noted on the subsequent drawings were "with integral disconnecting means unless otherwise noted."

D. Drawing E–4 depicts in part the wiring for the typical bathroom layout in the BEQ, including the location of the fan coil unit within each BEQ unit. The drawing shows power wiring coming directly to the fan coil unit, as mounted on the ceiling. No other wiring in connection with the fan coil unit is indicated, nor does the drawing show any disconnecting means for the unit. Contrarily, the drawing does show the switch wiring for the bathroom light and exhaust fan.

7. During the pre-bid stage of the contract in issue, plaintiff was engaged in constructing similar facilities for defendant under a prior contract. A change order negotiated under that prior contract authorized the payment to plaintiff of $51,501 for additional work associated principally with the installation of an energy efficient thermostat as part of the fan coil unit controls. It was clearly understood, under the prior contract, that a three-way fan speed switch controlling the fan coil unit fan was to be remotely mounted, with respect to the fan coil unit, on the wall separating the bathroom from the bedroom of each BEQ unit, adjacent to the thermostat. That understanding was not, however, explicitly incorporated in the change order.

8. Plaintiff's agent, Michael Fiorello, contacted a Mr. Hankins, a mechanical engineer of the defendant, in the pre-bid stage of the contract in issue with respect to the same matters that had been disposed of in the change order under the prior contract. Mr. Fiorello was assured that the specifications and drawings would be amended to conform to the change order under the prior contract. Mr. Fiorello's understanding was that the amended specifications and drawings, and particularly the electrical drawings, would also indicate that a fan speed switch for the fan coil unit and the necessary wiring was to be remotely located next to the thermostat on the bathroom wall of the units.

9. Amendment No. 2 to the contract issued March 18, 1977, provides an amended "Fan Coil Unit Control Diagram" (amending Drawing M–5), conforming the fan coil unit thermostatic controls and appurtenant wiring to those required under the prior contract and providing that the fan speed switch should be mounted on a separate wall plate adjacent to the thermostate. It did not include any amendments to either the mechanical or electrical drawings, however, showing the location and wiring of the remotely mounted fan speed switch, or that the fan speed switch would serve as the

disconnecting means for the fan coil unit in each room.

10. Plaintiff, as general contractor, was aware of its obligation to coordinate the mechanical and electrical divisions of the contract specifications and drawings. Plaintiff acted as its own mechanical subcontractor and, prior to bidding on the contract, solicited proposals from electrical subcontractors for the electrical work under the contract. The electrical work was ultimately awarded to Southerland Electric Company (Southerland) of Jacksonville, North Carolina.

11. In the course of construction under the contract, plaintiff was advised by one of defendant's engineers to install the fan speed switches for the fan coil units in a location on the bedroom walls of the BEQ units next to the thermostats and remote from the fan coil units themselves, as the switches had been installed under plaintiff's prior contract with defendant. Southerland, plaintiff's electrical subcontractor, demanded and received extra payment from plaintiff for installation of the remote fan speed switches for the reason that the necessary wiring and switch location was not shown in the contract specifications or drawings on the basis of which Southerland had made its pre-bid proposal to plaintiff.

12. Southerland installed the necessary conduits and wiring to locate the fan speed switches adjacent to the thermostats on the bathroom/bedroom walls of the BEQ rooms. As wired, the fan speed switches also served as a disconnecting means in the "off" position for the fan coil units.

13. Because the fan speed switch both controlled the operation of the fan coil unit fan and served as a disconnecting means (shutting off all electrical power to the fan coil unit in the "off" position), the wiring necessitated to remotely mount the switch was both "control" and "power" wiring within the meaning of the contract.

14. Defendant was satisfied that the manner in which the fan speed switch was wired and mounted by Southerland met the requirements of the contract even though no *integral* disconnecting means (such as a plug or switch inside the fan coil unit itself) was provided as per the mechanical specifications and drawings. Plaintiff, who provided the fan coil units under the contract, did not pre-order them with disconnecting switches and/or other controls built inside the cabinet.

15. Plaintiff's bid on the contract did not take account of the costs to be incurred in installing the conduit and necessary power and control wiring to remotely mount the fan speed switches for the fan coil units next to the thermostats on the bathroom/bedroom walls of the rooms constructed.

16. On April 25, 1979, plaintiff presented a claim pursuant to the "GENERAL PROVISIONS," paragraph 3 of the contract, entitled "CHANGES," for $23,014.00, the alleged extra cost incurred in running the conduit and wiring for the fan speed switches from the junction boxes behind the fan coil units to the fan speed switches mounted on the bedroom walls. Defendant has no prior written record of plaintiff raising any problem respecting the fan speed switch specifications. On August 15, 1979, the responsible contracting officer denied the claim. Plaintiff thereupon commenced this litigation by filing a petition for the same amount with the former Court of Claims on July 25, 1980.

## DISCUSSION

Plaintiff argues that the contract specifications and drawings are ambiguous and should therefore be construed against the Government so as to entitle it to relief. Defendant in its first argument ignores the issue of ambiguity and contends that plaintiff, as prime contractor, was responsible under the contract read as a whole for connecting the remotely mounted fan speed switches to the fan coil units and that its dispute over the extra cost is properly with its subcontractor, Southerland, and not with defendant.

Defendant addresses the ambiguity issue secondarily and from a number of angles. First it argues that the contract specifica-

tions and drawings are not in fact ambiguous. The second approach is that plaintiff's purported interpretation of the ambiguous provisions was in any case unreasonable. And third, defendant contends that plaintiff should not recover because it knew all along what wiring would be necessary to connect the fan coil units to the switches as a result of having done similar installations on the prior building contract.

■ This court's predecessor, the former Court of Claims, often considered whether contract ambiguities allow for an equitable adjustment in favor of the contractor. The rule is that if a Government contract is ambiguous and if the construction placed upon it by the contractor is reasonable, the contractor's construction will be adopted unless the parties' intention is otherwise affirmatively revealed. *Brezina Construction Co. v. United States,* 196 Ct.Cl. 29, 33, 449 F.2d 372, 375 (1971). The *Brezina* court stated further:

> A companion rule to the rule of ambiguities is that, where a bidder faced with a "patent and glaring discrepancy" fails to seek clarification from the contracting officer, the discrepancy should be construed against him. *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963). *See J.A. Jones Constr. Co. v. United States,* 184 Ct.Cl. 1, 12–13, 395 F.2d 783, 789–90 (1968). This principle places a wise limitation on the rule of ambiguities, but, unfortunately, puts the court in the unenviable position of having to distinguish between ambiguities and patent discrepancies. Needless to say, there can be no fixed rule for making this determination in every instance. "What constitutes a patent and glaring omission cannot * * * be defined generally, but only on an *ad hoc* basis by looking to what a reasonable man would find to be patent and glaring." *L. Rosenman Corp. v. United States,* 182 Ct.Cl. 586, 590, 390 F.2d 711, 713 (1968).

*Id.* at 34, 449 F.2d at 375.

■ The initial inquiry that must be made here is whether or not the contract specifications and drawings concerning the location and wiring of the fan speed switches are ambiguous. The court believes that the documents on their face clearly support the conclusion that they are.

The mechanical specifications state that controls for the fan coil units "shall be furnished by the temperature control manufacturer for mounting inside the cabinet" while mechanical drawing M–5 says that the fan speed switch shall be mounted adjacent to the thermostat in each BEQ room. Mechanical drawing M–2, showing the location of the thermostat, however, does not show the fan speed switch in any way. Further ambiguity arises in connection with the electrical aspects of the fan speed switch. The mechanical specifications clearly state that while control wiring should be provided under the mechanical division, electrical wiring would be provided for under the electrical division. The fan speed switch, as installed to defendant's apparent satisfaction, however, had both a control (fan speed) and electrical (power on and off, or "disconnecting") function.

Compounding this confusion are the electrical specifications and drawings. The specifications provide that "disconnect switches" (turning power on and off) were to be provided where indicated, but that various control devices and their wiring were to be provided under the mechanical division. The electrical drawings noted that the fan coil units were "with integral disconnecting means unless otherwise noted," i.e., were supplied with on and off switches as part and parcel of the units themselves. This would have indicated to an electrical subcontractor that electrical power wiring for the units need only be provided to the vicinity of the unit itself, near the ceiling. The electrical drawings do not anywhere show power or control wiring running from the units to the vicinity of the thermostats on the bathroom walls. An electrical subcontractor who cross-referenced the mechanical specifications would have found that, as stated above, "controls" were to be mounted inside the cabinet, and he would have left the matter at that. The mechanical drawings, indicating a three-

speed fan switch on the wall, although contradicting the mechanical specifications, would also have been of little concern to the electrical subcontractor, since there was nothing to indicate that the switch would serve as a disconnecting means and therefore require power wiring (under the electrical division) to it.

Defendant's argument that the contract is not ambiguous is premised on the view that it might have been performed as written. According to defendant, this would have required the installation of the fan coil units with integral disconnecting means *and* the remotely mounted fan speed switch as a control only. Defendant asserts that the installation of the switch with the double function of control and disconnecting means, and the associated power wiring problem, constituted a contract breach on plaintiff's part.

A literal reading of the contract lends some support to defendant's view. However, in view of the fact that the installation of the fan speed switches serving the double function was satisfactory to defendant and approved while construction was in progress under both the prior contract and the instant one, and that defendant does not seriously litigate its breach of contract claim, the court believes defendant's argument on the ambiguity question is without proper foundation.

■ The next question is whether the ambiguity described above is so "patent and glaring" as to have required Sofarelli to seek clarification from the contracting officer prior to submitting its bid. It is appropriate to note at this point that the duty to inquire also arises where a contractor is faced with an obvious omission, inconsistency or discrepancy of significance in the subject contract. *Space Corp. v. United States,* 200 Ct.Cl. 1, 5, 470 F.2d 536, 538 (1972). This rule of law is incorporated in many Government contracts with respect to both their bid and performance stages, as it was in the "BIDDING INFORMATION" and "GENERAL PROVISIONS" sections of the contract in issue, as outlined above.

In this case the *ad hoc* determination of whether the contract ambiguity was patent enough to raise a duty on Sofarelli's part to inquire, the parameters of that duty once it arose, and the reasonableness of Sofarelli's contract interpretation in the absence of adequate clarification are interconnected. Weighing a number of factors present in the record bearing on these questions, the court holds the opinion that it was incumbent on Sofarelli to ensure that the specifications and drawings were amended to reflect the necessary conduit and wiring for remotely mounting the fan speed switches next to the thermostat and that the defendant should not now be called upon to ensure whatever extra costs were incurred to properly wire and mount the switches to the Government's satisfaction.

■ In *Singer-General Precision, Inc. v. United States,* 192 Ct.Cl. 435, 427 F.2d 1187 (1970), the Court of Claims articulated a number of factors that enter into the factual analysis in determining whether a Government contractor's demand for extra compensation under an ambiguous contract rests upon a reasonable interpretation of that contract. It is important to consider how the contractor in fact did read the subject contract provisions "in all the surrounding circumstances." *Id.* at 441, 427 F.2d at 1190. The court should also attempt to reconstruct the plaintiff's "actual attitude" and question whether plaintiff's assumptions with respect to the contract were "hidden" from the Government. *Id.* at 442, 427 F.2d at 1190. Particularly pertinent to the instant case is the relevance of plaintiff's prior experience under similar contracts. *Id.* at 443, 427 F.2d at 1190. Another consideration is the unreality of the Government's interpretation of disputed contract provisions. *Id.* at 445, 427 F.2d at 1192. In *Astro-Space Laboratories, Inc. v. United States,* 200 Ct.Cl. 282, 296, 470 F.2d 1003, 1011 (1972), the court also emphasized the plaintiff contractor's reliance on its interpretation either in submitting its bid or in performing the contract.

The backdrop to the instant controversy was the prior contract which Sofarelli was

performing when the bidding on the contract in issue took place. It is noteworthy that plaintiff provided this backdrop by introducing evidence of the prior contract, over defendant's objections, to prove that a "change order" under that contract had been negotiated between plaintiff and defendant to rectify, in part, the same extra cost problem occasioned by the installation of the fan speed switches that is the subject of this litigation. Sofarelli also sought to prove that it relied on that prior experience in its communications with defendant concerning problems under the instant contract. The evidence concerning the "change order" under the prior contract, however, shows that it concerned principally the installation of a new type of energy efficient thermostat, not the conduit and wiring for the remotely mounted fan speed switches. The evidence also demonstrates that even though the "change order" did not address itself to the remotely mounted fan speed switches, plaintiff nonetheless was very much aware under the prior contract that control and power wiring had to be run to the vicinity of the thermostats on the bathroom/bedroom walls in order to install the fan speed switches and that these switches were to operate as the disconnecting means for the fan coil units.

Plaintiff's "actual attitude" toward the contract in issue can be plausibly gauged from its experience under the prior contract which was a similar one. The record supports the inference that Sofarelli at all times in the bid and performance stages of the contract, both in its guise of prime contractor and mechanical subcontractor, knew or should have known, what conduit and wiring had to be installed to mount the fan speed switches next to the thermostats on the bedroom/bathroom walls of the BEQ rooms and that no other location for the switches was intended. Although there is some evidence that the contract specifications were subject to interpretation as allowing the fan speed switches and thermostats to be mounted within the fan coil unit cabinets, or next to the fan coil units near the ceilings of the individual rooms, there is no reason to believe that this alternative was ever seriously contemplated by either plaintiff or defendant.

In these circumstances it is apparent that in spite of ambiguity in the contract specifications and drawings, the question of reasonable interpretation is not material. Sofarelli never relied on a contract interpretation at odds with defendant and there were no hidden assumptions on either side. The question is rather one of obvious omission on the part of the Government to depict the wiring for the fan speed switches explicitly in either the electrical or mechanical divisions of the contract and, because of its prior knowledge of what would be required, Sofarelli's duty to see that proper amendments were made to the specifications and drawings.

Plaintiff's pre-bid conversation with a Mr. Hankins, a Government engineer, concerning the same matters which had been taken care of with a change order under the prior contract, i.e., the energy efficient thermostats, apparently brought about Amendment No. 2 to the instant contract issued March 18, 1977. This was a drawing labelled "Fan Coil Unit Control Diagram," and clearly showed the fan speed switch with "Off/Hi/Med/Lo" settings. It provided that the switch be installed on a separate wall plate adjacent to the thermostat. This amendment should have alerted Sofarelli to seek further clarification of the wiring necessitated for the fan speed switch, if it deemed it necessary for bidding purposes.

Sofarelli's position vis-a-vis Amendment No. 2 is analagous to that of the contractor in *Merando, Inc. v. United States,* 201 Ct.Cl. 23, 475 F.2d 601 (1973). In *Merando, Inc.,* the Government amended its contract in the pre-bid stage a number of times with certain revised drawings. Two of these drawings detailed work to be done outside Merando, Inc.'s contract "limit line" (its particular zone of operation), but meant to be completed by it. Merando, Inc. sought to recover sums in addition to the amount bid for the additional work required outside the "limit line" on the ground of ambiguity. With respect to the Government's failure to specifically indicate to Merando, Inc. that it

would be required to perform the work outside the contract limit line shown on the amended drawings, the Court of Claims stated:

> * * * it evidenced an *obvious omission* on the part of the government. This imposed upon the contractor a duty to inquire if he intended to benefit from his interpretation in the future.
>
> Prior to submission of its bid, plaintiff received the revised drawings which reflected the new work without altering the contract limit line. Plaintiff also received additional detailed drawings which described only the work outside of the limit line. There would have been no reason for the government to send these detailed drawings if the contractor was not meant to include this additional work when submitting its bid. * * *

*Id.* at 27, 475 F.2d at 603 (citations omitted) (emphasis original).

Similarly, in the instant case, Amendment No. 2, though not specifically illustrating the position of the fan speed switch and causing a discrepancy with other specifications, should have alerted plaintiff to clarify that position and its attendant wiring problems.

Sofarelli argues that it did in fact attempt to clarify the fan speed switch problem with Mr. Hankins in the pre-bid stage and that it had been assured that the matter would be taken care of by a contract amendment. This conversation apparently occurred prior to the issuance of Amendment No. 2 on March 18, 1977. While the court does not doubt, as defendant suggests, that such a conversation took place, it is apparent that the principal purpose was to conform the specifications and drawings for the energy efficient thermostat that was the subject of the change order under the prior contract. There is nothing in the record to have warranted a belief on plaintiff's part that the Government would amend the mechanical and electrical specifications and drawings to precisely indicate the wiring that was to run from the fan coil unit to the fan speed switch.

Rather than satisfying plaintiff's duty to inquire, plaintiff's contact with the Government and its receipt of Amendment No. 2 should have alerted it to more diligent clarification in writing and on the contract drawings of the fan speed switch wiring problem. Plaintiff knew where the fan speed switch was to be located and also knew, or should have known, that it was to act in both a "control" and "disconnecting" capacity, therefore requiring "power" wiring being brought to the switch. If it was to complain successfully that the work was principally electrical, rather than mechanical, and should have been included in the electrical specifications and drawings, then plaintiff should have made certain appropriate contract amendments were made. Contractors were encouraged to seek corrections to the bid package in subsection 5 of section 00101 of the contract entitled "BIDDING INFORMATION."

In the circumstances of this case, the duty to clarify rested heavily on Sofarelli. The contact with defendant's agents over the thermostat was hardly sufficient to satisfy this duty with respect to the fan speed switch. Furthermore, not having satisfactorily clarified the matter in the prebid stage, plaintiff never properly communicated with the contracting officer concerning the contract discrepancies over the fan speed switches as he was required to do under GENERAL PROVISIONS, paragraph 2 of the contract. "[W]ithout complying with this provision, the contractor proceeds 'at his own risk and expense.' * *." *James A. Mann, Inc. v. United States,* 210 Ct.Cl. 104, 122, 535 F.2d 51, 61 (1976) (citations omitted).

Defendant points out correctly that it was almost two years after the contract was awarded that plaintiff brought the matter in writing to the attention of defendant's resident officer in charge of construction by letter dated April 25, 1979. This was a claim pursuant to the "CHANGES" clause of the contract. In the *James A. Mann, Inc.* case, the Court of Claims labelled the plaintiff's position claiming ambiguity an "afterthought" because it was inconsistent with its prior con-

duct. *Id.* at 120, 535 F.2d at 60. In the instant case, plaintiff's position seems an afterthought, not so much in the sense of an inconsistency, as in that of a delayed reaction. Plaintiff's letter recalls "conferences" relating to a change order for the remotely mounted fan speed switches "months ago." Defendant has no record of such conferences, however.

On the record before the court, it is plain that whatever efforts Sofarelli made to clarify the fan speed switch situation were insufficient to "bridge the crevasse in [its] own favor." *Beacon Construction Co. v. United States,* 161 Ct.Cl. 1, 7, 314 F.2d 501, 504 (1963).

## CONCLUSION

Based on the above, it is concluded that plaintiff is not entitled to recover, and that plaintiff's petition be dismissed and judgment be entered accordingly.