The **FIRESTONE TIRE & RUBBER**
COMPANY

v.

The **UNITED STATES.**

No. 246-69.

United States Court of Claims.

June 11, 1971.

Loren K. Olson, Washington, D. C.,
attorney of record, for plaintiff.

R. W. Koskinen, Washington, D. C.,
with whom was Asst. Atty. Gen. L. Pat-
rick Gray, III, for defendant.

Before COWEN, Chief Judge, and
LARAMORE, DURFEE, DAVIS, COL-
LINS, SKELTON, and NICHOLS, Judg-
es.

ON PLAINTIFF'S MOTION AND DE-
FENDANT'S CROSS MOTION
FOR SUMMARY JUDGMENT

DURFEE, Judge.

This is a Government contracts case
wherein plaintiff, a body corporate of
the State of Ohio, seeks review of an ad-
verse decision rendered by the Armed
Services Board of Contract Appeals
(hereinafter the Board or ASBCA), un-
der the provisions of the Wunderlich
Act, 41 U.S.C. §§ 321, 322 (1964). In
the proceedings before the Board, the
parties filed a Stipulation of Facts which
has been incorporated in major part be-
low. The controversy focuses upon the
proper and reasonable interpretation of
the Price Escalation clause which be-
came an integral part of the contract in
suit.

On May 14, 1965, defendant, acting
through the United States Army Tank-
Automotive Center, issued an Invitation
for Bids for the production and delivery
of Shoe Assemblies, Rubber, Track, for
tanks. At the time the invitation for
bids was issued, as stated therein, de-
fendant had a present two-year require-
ment for track shoe assemblies. The in-
vitation further stated that the contract
would be awarded to fulfill this require-
ment either in whole on a multi-year
basis identified as Alternate A in the bid
schedule, or in part on a single-year
basis identified as Alternate B. Alter-
nate A of the bid schedule was divided
into two Program Year increments; the
first year increment consisting of 224,886
track shoe assemblies and the second
year increment consisting of an addition-
al 243,000 assemblies. Defendant reserv-
ed the right to increase the quantity of

each program year by not more than 50 percent.

The invitation for bids further provided that in the event an award was made under Alternate A, the contract would be subject to the Limitation of Price and Contractor Obligations clause which stated:

(a) This clause applies only in the event this contract is awarded on the alternative basis for award described in the Schedule as "Multi-Year Procurement."

(b) Funds are available for performance of this contract in the amount specifically described in the Schedule, as available for contract performance. The amount of funds so described at the time of award is not considered sufficient for the contract performance required by and described in the schedule for any Program Year other than the First Program Year. Upon availability to the Contracting Officer of additional funds sufficient for performance of the full requirements for the next succeeding Program Year, the Contracting Officer shall, not later than the date specified in the schedule, unless a later date is agreed to by the parties, so notify the Contractor in writing and the amount of funds described in the schedule as available for contract performance shall be modified accordingly. This procedure shall apply for each successive Program Year.

(c) The Government is not obligated to the Contractor for contract performance in any monetary amount in excess of that described in the schedule or modifications thereto, as available for contract performance.

(d) The Contractor is not obligated to incur costs for the performance required for any Program Year after the first unless and until he has been notified in writing by the Contracting Officer of an increase in availability of funds in accordance with paragraph (b) of this clause. If so notified, the Contractor's obligation shall be increased only to the extent contract performance is required for the additional Program Year for which funds have been made available.

\* \* \* \* \* \*

The invitation required that bids be submitted for the entire quantity of each item under both Alternates A and B, or for Alternate B only. In addition, bidders were instructed to submit identical unit price bids for each of the two Program Year increments covered by Alternate A, i. e., the second year increment was to be bid at the same unit price as that submitted for the first year increment. However, the invitation for bids provided that in the event award was made under Alternate A, the contract would be written on a firm fixed price basis, subject to the contract provision entitled "Price Escalation" for the second program year.

Plaintiff submitted identical unit price bids of $23.33 for each of the two Program Year increments. In view of the provision for price escalation, plaintiff's bid included no contingency allowance in the unit prices to cover possible fluctuations in cost which might occur during the second year of performance. As low bidder, plaintiff was awarded the contract on July 1, 1965.

Pursuant to the conditions outlined in the invitation for bids, plaintiff was notified, by Change Order dated July 5, 1965, that the second year increment had been funded and production of the same was accordingly authorized. By Change Order dated May 31, 1966, defendant exercised its option to increase the quantity of the second year increment by 50 percent.

The Price Escalation clause set forth in the invitation for bids and in the contract is as follows:

(a) At such times as, pursuant to the clause entitled *Limitation of Price and Contractor Obligations*, notification is given the contractor as to the availability of funds for second increment, the unit prices for said items shall be the original prices therefor as

shown in the schedule hereof subject to an adjustment, *upward* or *downward*, on the following terms and conditions:

(1) The first published final "Wholesale Prices and Price Indexes" published monthly by the U. S. Department of Labor for the month in which the bid opening date falls shall be the base for the purpose of price adjustment under this clause. The basis upon which the price escalation shall be made is as follows:

(i) Rubber, Synthetic will have a weight of 10% of the unit selling price of the track assembly, and the price will be adjusted based on the Index cited above under reference 0712.[1]

(ii) Steel Products will have a weight of 90% of the unit selling price of the track assembly, and the price will be adjusted based on the Index cited above under reference 1014.

(2) The unit prices to be applicable to the items under the second increment shall be the original contract unit prices set forth in the schedule increased or decreased to reflect the percentage difference between the base index price referred to above and the first published Final Price Index for the month of last contract scheduled delivery date for preceding increment. This amount will be inserted by modification pursuant to the provisions of the "Limitation of Price and Contractor Obligation" clause.

(3) The upward adjustment under this provision shall not exceed five percent (5%), i. e., the revised unit prices which may result from the application of this Price Escalation provision shall, in no event, be more than 5% higher than the original unit prices

for said items as set forth in the schedule hereof. The downward adjustment shall be unlimited.

All of the contract documents, including the language of the Price Escalation clause, were prepared by defendant without the advice or consultation of plaintiff. Plaintiff did not question any clause or seek clarification or amendment of any language prior to award of the contract.

The "Wholesale Prices and Price Indexes" (hereinafter Index) referred to in the Price Escalation clause is designed to measure average changes in prices of all commodities sold in primary markets of the United States. Specifically, it compiles and publishes wholesale price indexes for "commodity groups", e. g., reference 10, Metals and Metal Products; "subgroups", e. g., reference 101, Iron and Steel; "product classes", e. g., reference 1014, Finished Steel Products; and "individual commodities", e. g., reference 1014–37.03, Bars, H.R., Alloy (described below as Steel, Forging). Each individual commodity in the index is representative of a class of prices and is assigned its own statistical weight plus the statistical weights of other commodities not directly priced but whose prices are known or assumed to move similarly. The statistical weight for the product class is the total of the statistical weights of the individual commodities included in the product class. The price index for the product class "Finished Steel Products" (reference 1014), is the statistically weighted average of the individually weighted price indexes of approximately 50 individual commodities, at least three, but no more than five of which are used in the manufacture of track shoe assemblies.[2]

---

1. The allocated 10% of the unit selling price of the track assemblies representing synthetic rubber is not in issue. There was no change in either the price index listed beneath reference 0712 for the rubber product utilized in the manufacture of the track assemblies, nor in the composite price set forth opposite reference 0712. Thus, no adjustment or escalation of the contract price is possible with respect to the rubber components.

2. Included in the items listed under reference 1014 are found such steel products as railroad rails, tie plates, wheels, axles, oil well casing, tin plate, staples, barbed wire, wire fencing, etc., all of which are unrelated to the manufacture of track shoe assemblies.

Approximately 63 pounds of steel were required in the manufacture of each track shoe assembly. The component breakdown by weight, including the applicable individual commodity reference in the Index, is set forth in the following table:

| Component | Approximate weight | Specified steel | Applicable price index |
|---|---|---|---|
| Tube | 10½ pounds | Carbon Steel Tubing | 1014–63.04 |
| Pins | 16½ pounds | Steel, Forging | 1014–37.03 |
| | | or | |
| | | Tubing, Steel, Alloy, Seamless. | Not indexed |
| End Plate, Center Guide, Caps and Wedges. | 28 pounds | Steel, Forging | 1014–37.03 |
| End Connector | 8 pounds | Steel, Forging | 1014–37.03 |
| | | or | |
| | | Steel, Casting | Not indexed |
| Wire | 1 ounce | Steel Wire | 1014–76.05 |

It should be noted that in two instances —pins and end connectors—the specifications permitted plaintiff to use alternate steel products. Although these two alternate types of steel have not been individually indexed beneath reference 1014, the parties have stipulated that their prices and price movements have been imputed to some indexed commodity or commodities. The significance of these unindexed steel commodities with respect to our final determination of liability will be discussed more fully below.

The first published final price Index for June 1965 (the month in which the bids were opened) and March 1966 (the month in which the last deliveries were made for the first contract year) for reference 1014 and for the relevant individual commodities, included as follows:

| Index No. | Price index | | Difference |
|---|---|---|---|
| | June 1965 | March 1966 | |
| 1014 Finished Steel Products | 104.3 | 109.0 | +4.7 |
| 1014–37.03 Bars, H. R., Alloy | 107.9 | 112.5 | +4.6 |
| 1014–63.04 Mechanical Tubing, Carbon | 103.2 | 104.4 | +1.2 |
| 1014–76.05 Drawn Wire, Carbon | 102.4 | 103.8 | +1.4 |

By letter dated July 25, 1966, plaintiff requested that defendant escalate the contract unit price in accordance with the provisions of the Price Escalation clause for the second year increment of 243,000 track shoe assemblies, as well as for the 50% increase in quantity ordered by defendant on May 31, 1966. It is plaintiff's contention that the language of the Price Escalation clause, reasonably interpreted, requires the use of the indexed prices which appear as sub- items *under* and *beneath* the composite price index for product class, reference 1014, and which relate to the specific individual steel commodities used in the manufacture of track shoe assemblies.

On August 4, 1966, the Contracting Officer (hereinafter C.O.) informed plaintiff that the provision of the Price Escalation clause stating that the contract price would be adjusted "based on the Index cited above under reference 1014", was interpreted by defendant to

refer to the composite price index set forth *opposite* reference 1014, Finished Steel Products, in the Index. Defendant asserts that the only reasonable interpretation of the Price Escalation clause requires that the word "under" be accorded the meaning *in accordance with*.

On November 15, 1966, the C.O. rendered a final decision sustaining defendant's interpretation of the Price Escalation clause and denying plaintiff the full price escalation requested under the terms of the contract. Upon timely appeal to the ASBCA, the final determination of the C.O. was affirmed, and plaintiff's appeal was denied on March 18, 1968.[3]

On May 16, 1969, plaintiff instituted this action, and the case now comes before the court on plaintiff's motion and defendant's cross motion for summary judgment.

The rules of contract interpretation, which control the eventual disposition of this case, are well settled. As far back as the turn of the 19th century, it has been a fundamental precept of common law that the intention of the parties to a contract control its interpretation. United States v. Gurney, 8 U.S. (4 Cranch.) 333, 2 L.Ed. 638 (1808); Ogden v. Saunders, 25 U.S. (12 Wheat.) 213, 6 L.Ed. 606 (1827); Bradley v. Washington, Alexandria & Georgetown Steam Packet Co., 38 U.S. (13 Pet.) 89, 10 L.Ed. 72 (1839). This bedrock of contractual analysis has withstood the test of time undiminished, and has attained an even greater measure of significance in the complex field of Government contracts. W. G. Cornell Co. v. United States, 376 F.2d 299, 309, 179 Ct.Cl. 651, 666 (1967); Hol-Gar Manufacturing Corp. v. United States, 351 F.2d 972, 976, 169 Ct.Cl. 384, 389 (1965). Both parties are presumed to be endow-

ed with at least a modicum of business acumen. Franklin Co. v. United States, 381 F.2d 416, 180 Ct.Cl. 666 (1967). This presumption has especial attachment to the drafting party who must bear the risk of any contractual uncertainty, ambiguity or inequitable consequence. Sturm v. United States, 421 F. 2d 723, 727, 190 Ct.Cl. 691, 697 (1970); Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390, 418 (1947). Unfortunately, though, the parties' long years of practical experience and vast technical resources too often bear nothing more fruitful than poor draftsmanship or contrived analysis. In any event, the language of a contract must be afforded the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances. Hol-Gar Manufacturing Corp., *supra*, at 388, 351 F.2d 972; Deloro Smelting and Refining Co. v. United States, 317 F.2d 382, 386, 161 Ct.Cl. 489, 495 (1963). This frequently entails placing ourselves "into the shoes of a 'reasonable and prudent' construction contractor" when we consider the language of the contract and attempt to divine its meaning. Hegeman-Harris & Co. v. United States, Ct.Cl., 440 F.2d 1009 (decided April 16, 1971). The unexpressed, subjective unilateral intent of one party is insufficient to bind the other contracting party, especially when the latter reasonably believes otherwise. Singer-General Precision, Inc. v. United States, 427 F.2d 1187, 1193, 192 Ct.Cl. 435, 446–447 (1970); *Sturm, supra;* L. Rosenman Corp. v. United States, 390 F.2d 711, 714, 182 Ct.Cl. 586, 590 (1968); Jack Stone Co. v. United States, 344 F.2d 370, 375, 170 Ct.Cl. 281, 289 (1965); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 877, 163 Ct.Cl. 1, 6 (1963); Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75, 86 (1960).

---

3. It should be noted that the parties petitioned the Board to render a decision on the question of liability alone. The Stipulation of Facts filed with the Board stated that the parties had agreed that in the event the Board's decision on the is- sue of liability was favorable to plaintiff, the parties should be granted an opportunity to negotiate an appropriate adjustment in the contract unit price based on such determination of liability.

What, then, is the most equitable interpretation of the contract language "under reference 1014"? Our first inquiry must be directed to the purpose of the Price Escalation clause and its relationship to the factual circumstances which prompted its use.

At the time the contract in suit was drafted, both parties anticipated the likelihood of an increase in the cost of steel products during performance of the second year increment. Cognizant of this projected escalation in material prices, a prudent bidder, who sought a multi-year procurement (Alternate A), would have been compelled to include unit price contingency allowances in his bid estimates for the second year increment to offset expected cost fluctuations. Thus, a definite competitive bidding advantage would accrue to a contractor bidding on a single-year basis (Alternate B), inasmuch as he would be free to ignore the implications of long-term material costs. According to defendant's counsel, this would have almost certainly led to the contract being awarded on a single-year basis, thereby frustrating defendant's admitted preference for a multi-year procurement.

It was precisely to eliminate any such inequity in the bidding procedure that the Price Escalation clause was originally formulated and thereafter incorporated into the bid documents and into the final contract. In his brief before the Board, defendant's counsel stated that, in response to these "facts of economic life," the purpose of the Price Escalation clause was to compensate plaintiff for "expected increased *material costs* during the later part of his production."[4] [Emphasis supplied.] As stated above, defendant specifically required, in the invitation for bids, that the unit price estimates submitted for each of the two program-year increments be identical. In fact, a bid submitted on any other basis would have been rejected as non-responsive. In addition, price escalation during the second year was to be measured in accordance with the "Wholesale Prices and Price Indexes." Indeed, there is no dispute that, in this manner, defendant effectively precluded the inclusion of unit price contingency allowances in bid projections for the second year increment, and the parties have so stipulated.[5]

The economic realities of a production contract dictated by sound business practice requires only that a contractor take account of price increases for those individual commodities which he must procure in order to fulfill his obligation under the agreement. To insure adequate remuneration for price escalation during the latter part of production, therefore, his formal bid need only reflect contingency allowances for those commodities specified for use in the contract. However, defendant's arguments are grounded on the assumption that the parties' intent with respect to the Price Escalation clause was to eliminate bid contingency allowances for, among others, the expected price appreciation in such diverse raw materials as barbed wire, oil well casing, axles, nails, staples, etc. and other steel commodities which were not specified in the contract, and which bore no relationship whatever to the manufacture and delivery of track shoe assemblies. Of course, any anticipated or realized rise in the price of these materials, unrelated to the contract work, would have no appreciable effect on the contractor's costs. Thus, we reject as unreasonable defendant's premise that it was the intention of the contracting parties to compensate the contractor for price escalation in these non-related steel commodities on the assumption that

4. Brief for defendant before the ASBCA at 10–11.

5. Paragraph 9 of the Stipulation of Facts filed by the parties during the Board proceeding, and appended to plaintiff's petition herein, provides in part:

"* * * In view of the provision for price escalation, the bid submitted by appellant [plaintiff] for Alternate A included no contingency allowance in the unit prices to cover possible fluctuations in cost which might occur during the second year of performance."

they were included as factors for the composite price index "under reference 1014."

We recognize that the parties' adoption of the "Wholesale Prices and Price Indexes", as an independent standard for price escalation, eliminates the *direct* consideration of plaintiff's actual or estimated costs. Nevertheless, it does not restrict our consideration of the underlying basis for the existence of the Price Escalation clause. That is to say, although no direct computation of plaintiff's actual expenditures was contemplated, the escalation formula based upon the Labor Department's Index was intended to represent a reasonable and expeditious method of closely approximating the expected increase in plaintiff's actual production costs during performance of the second year increment, in order to accommodate plaintiff's just claim to reimbursement. At the same time, it eliminated the extensive time, effort and expense required for the preparation and submission of actual cost data.

Even assuming, as the Board did, that the Price Escalation clause was intended to compensate plaintiff for fluctuations in the "full gamut" of contract costs (presumably including the costs of labor and other material and supplies), we cannot say that the composite product class price index is more reasonable as a basis for escalation. We fail to see how price fluctuations in many non-related materials such as barbed wire can be of any relevance to plaintiff's labor or other contract costs. To the contrary, it seems that, in this instance, the true arbitrary nature of the use of the product class index to determine escalation becomes even more evident. Whatever contract costs the Price Escalation clause was intended to cover, the fact remains that plaintiff's interpretation, unlike that of defendant, provides for escalation on the basis of

factors having a direct and specific relationship to performance of the contract. We regard this as the critical if not the controlling difference between the two approaches.

As plaintiff's costs, whether they be actual, estimated or conceptual, provide the substance upon which the existence of the Price Escalation clause rests, it would certainly be undesirable to impose a judicial interpretation which could conceivably withhold from plaintiff the major portion of his actual cost increases.[6] We do not believe that, at the time this contract was negotiated, either party intended to conclude an instrument which might theoretically produce either a diminution in the second year contract price, even though costs of the materials specified in the contract and used during performance therein increased, or, conversely, an escalation in contract price, even though the costs of the contract materials decreased substantially.

■ For these reasons, we hold that the reasonable and proper interpretation of the Price Escalation clause, in general, and the phrase "under reference 1014", in particular, requires that price escalation, under the terms of the contract, be effected in accordance with the comparative data derived from the indexed prices of the specific individual steel commodities specified for use in the contract. Said commodities are enumerated directly beneath or below the composite product class index, reference 1014, in the "Wholesale Prices and Price Indexes."

We have recently held that "[t]he ASPR is law which governs the award and interpretation of contracts as fully as if it were made a part thereof." Chris Berg, Inc. v. United States, 426 F.2d 314, 317, 192 Ct.Cl. 176, 182 (1970). We take special note of ASPR 3.404-3(a) (32 C.

---

6. A comparison of the pertinent statistics is quite striking. Whereas the product class index rose +1.2 during the escalation period, the price indexes for the individual steel commodities used in performance of the contract rose +4.7, +4.6 and +1.4 respectively. Although we do not at this point make precise computations, suffice it to say that the difference in dollars and cents between the two formulas is substantial.

F.R. § 3.404–3(a)) which provides as follows:

### 3.404–3 *Fixed-price contract with escalation.*

(a) *Description.* The fixed-price contract with escalation provides for the upward and downward revision of the stated contract price upon the occurrence of certain contingencies which are specifically defined in the contract. The risks in a fixed-price contract are reduced by the inclusion of escalation provisions in which the parties agree to revise the stated price upon the happening of a prescribed contingency. Where escalation is agreed upon, upward adjustments shall be limited by the establishment of a reasonable ceiling, and provisions will be included for downward adjustments in those instances where the prices or rates fall below the base levels provided in the contract. In the establishment of the base levels from which escalation will operate, contingency allowances shall be eliminated from the base to be set forth in the contract to the extent that escalation is provided for any particular contingency. Generally, escalation provisions are of two broad types:

(1) *Price escalation* provides for adjustment of the contract price on the basis of increases or decreases from an agreed upon level in published or established prices of *specific items or in price levels of the contract end items.* [Emphasis supplied.]

\* \* \* \* \* \*

The *italicized* words are particularly significant. The price index set forth opposite reference 1014 does not reflect the price or prices of an individual or specific item or of a contract end item. Rather, it is a statistically weighted composite of a large number of individual commodities. In contrast, the index for each individual steel product, *e. g.*, Bars, H.R., Alloy or Mechanical Tubing, Carbon, listed beneath reference 1014 represents the price or prices of a specific item or commodity. Thus does plaintiff's interpretation of the Price Escalation clause conform to the above-quoted provision for contract price adjustment on the basis of "specific items or in price levels of the contract end items."

It is true, as the Board pointed out, that this precise Price Escalation clause is not specifically recognized by ASPR.[7] Hence, the regulations are not dispositive. Nevertheless, ASPR does provide useful and valuable guidelines for the resolution of all Government contracts cases, and although we do not rely on ASPR as the sole or even primary basis for our final determination, we do find within its provisions ample support for our holding.

Both parties have devoted the major portion of their oral argument and written briefs before the court and the Board to a detailed analysis of the literal language of the Price Escalation clause, especially with respect to the plain and ordinary meaning of the phrase "under reference 1014." However, we are inclined to agree with the ASBCA which stated in its opinion that the least desirable means of determining the validity of the possible expenditures involved in this case is to rely upon a dictionary definition of "so chameleonic a word as 'under' ".[8] "[T]he context and inten-

---

7. We quote from the Board opinion, ASBCA No. 12072, 68–1 BCA Par. 6939 at 32,085:
   "\* \* \* Four of the five standardized price escalation clauses published in ASPR (see 7–106) are directed toward direct pricing of the end-item supplied by the prime contractor. The remaining clause (ASPR 7–107) is directed partly toward indirect pricing of the end-item based specifically on and reflecting fluctuation of designated costs incurred by the prime contractor on (1) in-house labor and (2) purchased parts or materials. Except for prime contracts to supply basic metals (steel, aluminum, bronze or copper mill products), the clauses are designated for use only in negotiated contracts. \* \* \*"

8. Firestone Tire & Rubber Co., ASBCA No. 12072, 68–1 BCA Par. 6939 at 32,-084.

tion [of the contracting parties] are more meaningful than the dictionary definition." Rice v. United States, 428 F. 2d 1311, 1314, 192 Ct.Cl. 903, 908 (1970). In *Rice*, this principle was held similarly applicable to the word "request" which was contained in the contracts price adjustment clause. In the instant case, the value of this principle is obvious. Many commonly used words or phrases are susceptible to more than one, and often as many as five or six, reasonable dictionary definitions. Therefore, the exact definition which is proper in any given set of circumstances depends almost exclusively upon the context in which the word or phrase is used and the intention of the parties. There is no doubt, for example, that, in certain instances, the word "under" can only be understood to mean "in accordance with". Thus, it is quite likely that defendant would have prevailed, or that no dispute would have arisen, if the contracts Price Escalation clause had been drafted with more specificity, *e. g.,* "and the price will be adjusted based on the [product class] Index [for Finished Steel Products] cited under reference 1014." Further, defendant's arguments would have carried far greater weight if every individual commodity, or at least the vast majority of steel commodities enumerated beneath reference 1014 were products specified for use in the contract. However, such was not the case here. To the contrary, we are convinced, as stated above, that the phrase "under reference 1014", as used in the contract, is sufficiently clear in the context, and should be interpreted in accordance with plaintiff's claim that price escalation was to be computed on the basis of the individual steel commodities listed directly beneath or below the composite product class index, reference 1014.

Having found that the questionable contract language, "under reference 1014", is sufficiently clear in its context, it follows, of course, that defendant's contention that the contract language gave rise to a patent ambiguity, placing plaintiff on notice and imposing a duty to inquire, is completely devoid of merit.

Defendant further asserts that plaintiff's proposed construction of the Price Escalation clause will lead to an escalation formula which is arithmetically impractical and unnecessarily complex. Specifically, defendant argues that as a result of the alleged absence of index listings beneath reference 1014 which are applicable to two of the steel products specified in the contract for use in the manufacture of track shoe assemblies, at least part of the computations for final price escalation will require extra-contractual negotiation between the parties. In response, we quote paragraph 12 of the Stipulation of Facts, filed in the proceedings before the Board and reaffirmed by both parties in their briefs before the court:

> Although two of the types of steel permitted by the specifications are not individually indexed, their prices and price movements have been imputed to some indexed commodity or commodities. At this time, the parties have not determined to which commodity or commodities such imputation was made.

By this stipulation, the parties attempted to eliminate, as an issue in this case and as an obstacle to final price adjustment under the proper escalation formula, the existence and indefinite status of the two unindexed steel commodities. This clearly indicates that neither the contractor nor the Government contemplated any disagreement as to the future imputation of these unindexed products. Thus, it would be premature on our part to anticipate a conflict where one has not yet arisen.

In conclusion, we hold that the decision of the ASBCA is not supported by substantial evidence. A careful reading of the Board opinion leads one to conclude that its obvious distaste for what it considered to be "the complete artificiality" of the Price Escalation clause has tainted the Board's objective consideration of the narrow issues placed before it. Whatever may have been defendant's sub-

jective and unilateral intent, we believe that plaintiff construed the contract language in a reasonable and proper manner. That being the test, plaintiff's interpretation must be sustained. *Sturm, supra*; *Hol-Gar Manufacturing Corp. supra.*

Finally, we come to the question of damages, *i. e.*, the amount to which plaintiff is entitled under the Price Escalation clause of the contract. As stated previously, the parties filed a Stipulation of Facts which the ASBCA incorporated by reference as its findings of fact. Before this court, both parties have referred to and reaffirmed the contents of that stipulation. Paragraph 21 of the stipulation provides as follows:

> This Stipulation is entered into by the parties in order that the Board may render a decision on the question of liability, and it is agreed by both parties that in the event the Board's decision in this respect is favorable to appellant, the parties will be granted an opportunity to negotiate a suitable adjustment in the contract unit price, based upon such determination of liability.

The clear implication of this paragraph, construed together with paragraph 12 of the stipulation quoted above, as to the imputation of unindexed steel commodities to listed commodities, is that the amount of money due plaintiff under the contract is fixed and made certain as soon as the Price Escalation clause is finally administratively or judicially interpreted. Thus, the need for further deliberation, fact-finding, or computation was to be made unnecessary. That is to say, the parties have requested that both the Board and the court pass solely on the question of liability, reserving for themselves the ultimate determination of quantum. They requested that, in the event of a decision favorable to plaintiff, they be afforded an opportunity to conclude a negotiated monetary settlement in accordance with the correct interpretation of the Price Escalation clause.

The Supreme Court has stated that its policy approach to Government contracts cases, as expressed in United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963) and the cases that followed, is grounded, at least in major part, "on a respect for the parties' rights to contract and to *provide for their own remedies.*" [Emphasis supplied.] United States v. Anthony Grace & Sons, 384 U.S. 424, 429, 86 S.Ct. 1539, 1542, 16 L.Ed.2d 662 (1966). With this in mind, we will allow the parties thirty (30) days from this date in which to negotiate a monetary settlement in accordance with this opinion. At the end of this time period, the parties will present to the court a stipulation, signed by both parties, designating the full and proper amount of plaintiff's recovery. If any factual disputes arise during this period which the parties cannot resolve by themselves and which thereby makes a negotiated settlement impossible, then proceedings in this case will be stayed pursuant to Rule 167 for a period of ninety (90) days, commencing thirty (30) days from this date, and the case will be returned to the ASBCA for the purpose of computing the amount to which plaintiff is entitled in accordance with this opinion.

Accordingly, defendant's cross motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted. Judgment will be entered for plaintiff, said judgment to represent an adjustment in the contract unit price for the second year increment, as well as the additional quantity authorized by defendant's exercise of its 50 percent reserved option.