A & S TRANSPORTATION CO., A NEW JERSEY CORPORA-
TION, *ET AL.*, PLAINTIFFS, v. BERGEN COUNTY SEWER
AUTHORITY, *ET AL.*, DEFENDANTS.

Superior Court of New Jersey
Law Division

February 24, 1975.

*Mr. Richard Cooper* and *Mr. Robert Becker* for plaintiffs (*Messrs. McCarter & English,* attorneys).

*Mr. Albert Gross* and *Mr. David Carmel* for defendant Bergen County Sewer Authority (*Messrs. Gross, Demetrakis & Sinisi,* attorneys).

*Mr. Harry Melnick* and *Mr. Jared Stamell* for defendant General Marine Transport Corp.

PRESSLER, J. C. C., Temporarily Assigned. This opinion is filed pursuant to *R.* 2:5-1(b) and because of the novelty of the public bidding question involved. This action came before the court by way of plaintiffs' verified complaint and order to show cause, seeking to invalidate the award of the Bergen County Sewer Authority of a sludge removal contract to defendant General Marine Transport Corp. On the return day of the order all counsel stipulated that there was no genuine dispute of material fact and the matter was, therefore, by stipulation treated as a motion and cross motions for summary judgment.

The operative factual background of this controversy may be simply stated.

The Bergen County Sewer Authority (Authority), an agency organized pursuant to *N. J. S. A.* 40:36A–1 *et seq.*, requires as part of its utility operation the removal from its sewage treatment plant in Little Ferry of the sludge by-product of the treatment process. The sludge, amounting to approximately one-quarter million wet tons annually, is removed by barge and deposited in the Atlantic Ocean 4½ miles west of Ambrose Horn, a site designated and approved by the Federal Environmental Protection Agency (E.P.A.) The sludge removal is now being conducted by A & S Transportation Company pursuant to a seven-year contract with the Authority which terminates on April 5, 1975.

Some months prior to the contract termination date the Authority advertised for bids for a new sludge removal contract. In response thereto two bids were received: one from a joint venture consisting of the present contractor and Ocean Disposal, Inc., both New Jersey corporations (joint venture), and the other from General Marine Transport Corp., also a New Jersey corporation (General Marine). The contract was awarded by the Authority to General Marine and, on suit brought by the joint venture and a taxpayer, this court invalidated that award and directed that new bidding take place. No appeal was taken from that judgment by either the Authority or General Marine and consequently new bids upon a new notice to bidders and new specifications were sought. The same two bidders were again the sole bidders and the Authority, by resolution adopted on December 19, 1974, again awarded the contract to General Marine as the low bidder. Again the joint venture and a taxpayer, in this case one Ronald T. Kiley, challenged the award and again this court sustained the challenge.

The ground of the court's invalidation on this second challenge was based upon the absence in the bid documents of a stated standard for comparing the bids which, in accordance with the specifications, contained a number of variables.

The court did not make a finding that there had in fact been favoritism in the Authority's award to General Marine, or that any improper motive governed its analysis of the bids. It held only that in view of the number and nature of the variables contained in the specifications, the lack of a predetermined standard for comparing the bids created the opportunity for favoritism and that such an opportunity constituted a violation of the purpose and policy of the competitive bidding requirements of the Local Public Contracts Law, *N. J. S. A.* 40A:11-1 *et seq.*

The basis for the court's conclusion is readily apparent from an analysis both of the bid specifications and the bids as received. The basic design of the bid specifications was the seeking of a three-year sludge removal contract with four annual renewals thereafter at the sole option of the Authority. Bidders were asked, therefore, to bid for each of the seven consecutive years, commencing with the year beginning April 5, 1975. The first of two basic variables was the requirement of the specifications that each bidder submit two sets of unit price bids — one consisting of a fixed unit price per wet ton of sludge for each of the seven contract years, and the second consisting of a single unit price for the entire contract period based on 1974 cost levels, which would then be adjusted annually by the actual increase or decrease in the Wholesale Price Index of Industrial Commodities (WPI) published by the United States Department of Labor. The adjustment in the unit price bid would be made by applying the percentage difference between the WPI on July 1974 and the WPI at the start of each contract year.

The second basic variable resulted from the fact that the E. P. A. had advised the Authority that it would, sometime in 1976, designate a new dump site in the Atlantic Ocean beyond the present dump site. The only clear indication which the Authority had from the E. P. A. as to the location of the new dump site at the time it advertised for bids was the unlikelihood of its designation further than 75 miles from Ambrose Horn. This information it communi-

cated to bidders in the specifications. The specifications thus referred to the present dump site as site "A" and to the future, but still undetermined, dump site as site "B". Each bidder, therefore, was required, both with respect to the fixed price alternative and the WPI alternative, to bid a unit price for both dump sites for each of the seven years. Since the location of dump site "A" is known, the unit price included the transportation cost thereto. Since the location of the new site is not yet known, the unit price was required to contain two elements: the unit price per wet ton (including transportation to the present dump site) plus a per mileage per wet ton transportation cost from the present dump site to wherever the new dump site would be. In effect, then, each bidder was required to submit four bids for each of the seven years: a fixed price bid to dump site "A"; a WPI bid to dump site "A"; a fixed price bid to dump site "B", and a WPI bid to dump site "B", the dump site "B" bids having the additional element of the mileage transportation costs. There was, of course, also the uncertainty as to when commencement of the use of dump site "B" would be required, but the parties apparently agree that commencement in the second contract year was most probable.

To compound the complications imposed by these variables and uncertainties, it appeared when the bids were opened and compared that the joint venture had bid higher than the General Marine on the per wet ton element but lower than General Marine on the mileage cost to site "B". Therefore, the ultimate determination of the low bidder required, in addition to the other comparison standards and for comparison purposes only, a determination of where site "B" actually was going to be located, since the further away it was, the more favorable would be the joint venture bid and the less favorable the General Marine bid. That is to say, if the annual bids were plotted on a graph, the lines would

at some point intersect, depending on where dump site "B" was designated.

Faced with these variables and no predetermined standard for comparing the bids, the consulting engineer for the Authority, upon whose written recommendation the Authority relied in awarding the bid to General Marine, compared the WPI bids on the basis of an assumed future average annual increase in the WPI of 5% and 7½%. He further, for comparison purposes, assumed that dump site "B" would be located 55 miles from the present dump site. The engineer's analysis, based on these assumptions, produced the following comparisons:

1. If site "B" were 55 miles away and the WPI had an average annual increase of either 5% or 7½% for the entire seven-year contract period, and if dump site "A" were used for the first year of the contract and dump site "B" were used for the next six years of the contract, the joint venture WPI bid would be lower than the General Marine WPI bid both for each contract year and cumulatively.

2. If site "B" were 55 miles away and its use commenced in the second contract year, the General Marine fixed bid for each of the seven contract years and cumulatively would be lower than the joint venture fixed bid.

3. If site "B" were 55 miles away and the WPI had an average annual increase of 5% over the seven-year contract period, the joint venture WPI bid would be lower than the General Marine fixed bid.

4. If site "B" were 55 miles away and the WPI had an average annual increase of 7½% over the seven-year contract period, the General Marine fixed bid would be lower than the joint venture WPI bid.

The engineer's recommendation further noted that for the years 1965 to 1972 the WPI increase averaged less than 5%, was somewhat over 5% for the period 1972 to 1973, and went up 18% from 1973 to 1974. Based on the foregoing and the engineer's apparent belief that the WPI for the seven

future years of the contract period would exceed a 5% average annual increase, he recommended acceptance of the General Marine fixed bid as the lowest bid.

At the hearing the parties stipulated to the following additional comparative results:

1. For the entire contract period, both annually and cumulatively, the joint venture WPI bid would be lower than the General Marine fixed bid if the WPI increase did not average more than 6% annually and if site "B" were 55 miles away.

2. If site "B" were 75 miles away, i. e., the limit indicated by the E. P. A., and commencement of the use of site "B" were in the second year, the General Marine fixed price bid would be lower per year for the first three years but the joint venture fixed price bid would be lower for each of the next four years and cumulatively for the seven-year period.

There are numerous other permutations and combinations which also result in either one or the other being the low bidder, depending on how the variables are selected and compared.

██ As indicated, plaintiffs' basic attack on the bidding process was failure of the bid documents to state the standards upon which the bids would be compared. They take the position that the specifications should have stated both an assumed WPI increase and an assumed mileage to site "B" which would be used for the purpose of comparing bids, and that selection of comparison standards after the opening of the bids was improper. In making this argument, however, they concede too much. While an announced predetermination of the location of dump site "B" for comparison purposes might well have been both required and necessary in order to compare the bids, this court does not believe that a predetermination of an annual increase in the WPI for comparison purposes could have corrected what it conceives of as the basic and fatal flaw in the specifications, viz., the requirement of submission of both a fixed bid and a WPI bid. It is

evident that a fixed-price bid and a bid geared to a future statistical event are so qualitatively different as to defy comparison *inter se* if the salutary public purpose intended by the flexible bid is to be maintained. This court does not, of course, intend to suggest that the flexible WPI bid or that any other bid which is required to be tied to a future statistical economic determination is not appropriate. See, *e. g.,* generally *Firestone Tire & Rubber Co. v. United States,* 444 F. 2d 547, 195 Ct. Cl. 21 (Ct. Cl. 1971). Rather, such a bid may well be indicated in a fluctuating economy where a long-term contract is sought. It insures that the public will have the benefit of any decrease in market fluctuation over the term of the contract. It encourages competition in that potential bidders are relieved of a substantial economic risk and are, therefore, more likely to be induced to submit bids for a long-term period. Furthermore, such a flexible bid tends to insure the public of continued performance by the contractor, who might otherwise because of severe inflation during the contract term, find himself economically unable to meet his full contractual obligations. The essential purposes of the flexible bid and its consequence of having the future price abide the event, as it were, are therefore vitiated if the extent and direction of future economic fluctuation are preassumed, even for comparison purposes.

This is readily apparent from the facts here. For example, if the contract were awarded to General Marine on its fixed bid, but in the next seven years the average WPI increase is less than 6% a year, the Authority will have paid General Marine more than it would have had to have paid the joint venture for performance of the contract. What the WPI increase will be, in fact, not only for the next seven years but even for the next three years, is clearly a matter beyond any reasonable prediction at this time. The fact that it has increased dramatically in the past year is not a reliable basis for predicting its future course. That being so, the Authority could not have objectively found, as it purported to, that the General Marine fixed price bid was lower than the joint ven-

ture WPI bid. Thus, because of the inherent incomparability between these two types of bids and the self-defeating consequence of a predetermined WPI increase for comparison purposes, this court holds that it is improper to require bidders to submit both a fixed price and a flexible bid since it would never be possible to determine in advance of the actual future determination of the index which of those bids will yield the lower actual cost. For this reason alone, therefore, the award of the contract to General Marine cannot stand.

■■■ As to the mileage variable resulting from the imminent E.P.A. designation of the new site, the Authority contends first, that 55 miles was a reasonable choice for comparison purposes and, second, that its use as the comparison standard was inferable from the provision in the specifications fixing a 55-mile distance as the basis for calculating the amount of the required bid bond. As to the first of these contentions, neither the court nor the plaintiffs quarrel with the Authority's claim that 55 miles is, in fact, a reasonable comparison standard, representing as it apparently does, the average between the probable closest and the probable farthest point of the expected E.P.A. site designation. Its reasonableness—after the fact, however—is beside the point. The problem arises because in not determining that standard in advance of the bid opening, the Authority placed itself in the position of being thereafter able to favor either one of the two bidders. For example, it could have just as reasonably determined, after the bids were opened that the farthest limit should be used in its own protection as the comparative standard. In that case the joint venture fixed bid would have been the lower than the General Marine fixed bid for the seven-year period. As to the second of these contentions, the fixing of a standard for calculating the amount of security to accompany the bid cannot be regarded as the designation of a predetermined bid-comparison standard, particularly in view of section 1.11 of the contract specifications which specifically provides that all possible sites up to 75 nautical miles from Ambrose Horn must be considered as dump site "B".

It is clear that the public interest requires strict adherence to those requirements of the public contract law which are intended to preclude not only the actuality of, but also the potential for, improvidence, corruption, extravagance and favoritism in the awarding of contracts for public work. See generally, *Hillside Tp. v. Sternin*, 25 *N. J.* 317, 322 (1957); *Wm. A. Carey Co. v. Fair Lawn*, 37 *N. J. Super.* 159 (App. Div. 1955). The necessity for a predetermined and reasonable basis for comparing bids is evident if the potential for favoritism in the award is to be avoided. As pertinently observed in *James Petrozello Co., Inc. v. Chatham Tp.*, 75 *N. J. Super.* 173 (App. Div. 1962):

Where there is no standard or norm to guide or control the exercise of the municipal power, the possibility of partiality or even fraud is present. Where such possibility is present, that is enough to set aside the municipal action. There is no need to prove actual fraud or favoritism or collusion. The absence of proof of corrupt motives does not preclude the judicial remedy. The municipal action will be vacated where it amounts to a fraud on the bidding statute, even in the presence of good faith. [at 181]

It is clear that a standard or norm to guide or control the exercise of public power which is selected after, not before, the bids are opened and which is, moreover, selected from among a number of possible and equally reasonable alternatives, is as fatal to the bidding process as is the failure to apply any standard or norm at all. Thus, this court holds that where, because of circumstances inherent in the particular public work, variables must be included in the structuring of a request for bids, the common basis or standard to be used to compare the bids must be stated in the specifications themselves and may not be determined, no matter how reasonable they then are, after the bids have been opened.

In view of the foregoing, the court has no alternative but to invalidate the award to General Marine and to require that new bids be solicited pursuant to specifications which accord with the determinations herein made.