WESTERN EMPIRE
CONSTRUCTORS, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 789–86 C.

United States Claims Court.

June 13, 1990.

---

William J. Ferguson, Jr., McLean, Va., for plaintiff.

E. Kathleen Shahan, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen.

## OPINION

RADER, Judge.

This action arises under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988). Western Empire Constructors, Inc. (plaintiff) seeks payment for lowering light switch boxes in a Veterans Administration (VA) hospital. Plaintiff contends that its renovation contract at the hospital did not include lowering the switch boxes. Plaintiff therefore claims entitlement to additional compensation beyond the contract price. Defendant contends that the contract required plaintiff to lower the existing switch boxes.

Both parties have moved for summary judgment. After oral argument, this court grants defendant's motion for summary judgment.

## FACTS

On December 22, 1982, plaintiff entered a fixed-price contract with the VA. The contract required plaintiff to construct a new clinical support wing and to remodel another wing of the VA Medical Center in Denver, Colorado. The contract price was $34,056,000.00.

Before bidding, plaintiff visited the VA hospital. This visit provided plaintiff an opportunity to inspect the position of existing switch boxes in the wing to be remodelled.

The contract included drawings and specifications depicting work on the light switches and switch boxes. Among other things, the project converted the electrical works in the remodelled wing to a higher voltage. Therefore, the contract required plaintiff to remove all existing wall switches in the remodelled areas and replace them with new 120/277 volt switches. The contract also required plaintiff to relocate all existing switch boxes as required by the contract drawings.

The drawings showed the required location of each new switch box by the symbol

"S." From the drawings, plaintiff knew exactly where to install each new box during remodelling. The contract legend placed each "S" at 40″ above the finished floor.[1] The contract also indicated that the contractor was to remove, cut, alter, replace, patch, and repair existing work as necessary to install new work. Contract No. V101C–1102, Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, filed Oct. 26, 1988 (Contract, Def.Br.), Appendix (App.) at 8. The drawings did not show the location of existing switch boxes. From the drawings alone, plaintiff could not determine the location of switch boxes prior to remodelling.

On June 10, 1983, after entering the contract, the contractor requested additional information from the VA about the mounting height of the existing switches in retained walls. The VA responded that the contract drawings required mounting all switches 40″ above the finished floor, except for a 48″ requirement in the dental suite. On July 14, 1983, plaintiff again inquired about the mounting heights. The VA clarified that the switches could remain at the existing height (44″, 48″, or 52″) only in a few areas. Forty inches remained the standard elsewhere. In all, 1,262 switch boxes in the remodelled area needed lowering to comply with that standard. VA's Resident Engineer, Mr. Jim Price, granted plaintiff's request to lower the switches with a short piece of flexible metal conduit.

A dispute arose between plaintiff and the VA over payment for this work. Plaintiff insisted that the contract did not require dropping these switches to 40″. Plaintiff argued that, because the "S" symbols on the drawings were at approximately the same location as the existing switches, it had assumed that the "S" symbols were in fact referring to the existing switches. Plaintiff further contended that it had assumed, absent any indication in the contract to the contrary, that these switches were already at the required height of 40″.

Nonetheless, the VA directed plaintiff to lower the existing switches to 40″. Plaintiff complied. On October 5, 1983, the contractor submitted to the VA a claim for an increase of $183,580.00 for lowering the switches. The VA resident engineer rejected this claim. On October 23, 1985, plaintiff submitted to the VA's contracting officer, pursuant to 41 U.S.C. § 605(a) (1988), a certified claim for $217,640.00 and a seventy-five day extension as an equitable adjustment of the contract. Plaintiff's Project Manager, Mr. Tod Hannemann, signed and certified the claim as required by 41 U.S.C. § 605(c)(1) (1988).

On December 17, 1985, the contracting officer denied the claim. The contracting officer concluded that the contract drawings informed plaintiff of the requirement to relocate the existing switch boxes. Following this refusal, the subcontractors hired by plaintiff to install the switches revised their cost figures. The adjusted price came to $636,715.00. Plaintiff subsequently adjusted this figure downward to $482,260.88, which is the subject of this dispute.

Plaintiff instituted this action in the United States Claims Court seeking compensation for work in excess of contract requirements. Both parties have moved for summary judgment. This court must first decide whether plaintiff properly certified this claim. If plaintiff meets this jurisdictional requirement, the court must then decide whether the contract bound plaintiff to lower all existing switches in retained walls to 40″.

---

**1.** The Veterans Administration (VA) derived this 40″ height standard from its Construction Standard CD–28 "Accommodations for the Physically Handicapped:"

  i. Utility Outlets, Receptacles and Controls. The centerlines of utility outlets, receptacles, switches, and controls for light, heat (exclusive of thermostats), ventilation, windows, draperies, plumbing and all similar controls of frequent or essential use, shall be located where they will be accessible to the handicapped and shall be mounted within a range of 18 to 40 inches above the finished floor. Contract No. V101C–1102, Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, filed Oct. 26, 1988, Appendix at 14. CD–28 was not included in the contract specifications. The 40″ requirement, however, was evident from the contract.

## DISCUSSION

### Jurisdiction

■ Defendant argues that, because plaintiff did not properly certify its claim to the contracting officer before bringing this action, this court lacks jurisdiction to hear the claim. The Contracts Disputes Act requires that:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

41 U.S.C. § 605(c)(1) (1988). Before this court has jurisdiction, the contractor must (1) submit a written and properly certified claim to the contracting officer, and (2) obtain a final decision by the contracting officer. *Milmark Servs., Inc. v. United States,* 231 Ct.Cl. 954, 956 (1982), *aff'd,* 731 F.2d 855 (Fed.Cir.1984).

Defendant's only complaint is that plaintiff failed to satisfy these requirements because Mr. Tod Hannemann, the signatory of plaintiff's certification, was merely the project manager at the time. Defendant contends that the person signing the certification must be either an equity owner, director, or officer to qualify as "contractor" under the terms of 41 U.S.C. § 605(c)(1). *See, e.g., W.H. Moseley Co. v. United States,* 230 Ct.Cl. 405, 677 F.2d 850 (1982).

In the contract, the Disputes clause states:

> For contractor claims of more than $50,-000,
>
> . . . .
>
> [t]he certification shall be executed by the contractor if an individual. When the contractor is not an individual, the certification shall be executed by a *senior company official in charge at the contractor's plant or location involved,* or by an officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

Plaintiff's Appendix of Documentary Evidence, filed Nov. 25, 1988 (Pl.App.), at 28 (emphasis added). This language binds the VA as well as plaintiff.

Furthermore, Federal Acquisition Regulations (FAR) govern certification claims. *Ball, Ball & Brosamer, Inc. v. United States,* 878 F.2d 1426 (Fed.Cir.1989). FAR 33.207 contains the same certification requirements as the contract. 48 C.F.R. § 33.207 (1988). Although not an equity owner, director, or officer of Western Empire Constructors, Inc., Mr. Hannemann was a "senior company official in charge at the contractor's plant...." Mr. Hannemann, therefore, could sign plaintiff's certification. *See* Pl.App., at 172.[2]

Defendant cites no cases invalidating a project manager's certification. In *Moseley,* an economist executed the invalid certification. *Moseley,* 230 Ct.Cl. at 406–07, 677 F.2d 850. In *Ball,* a chief cost engineer executed the invalid certification. *Ball,* 878 F.2d at 1426. Mr. Hannemann's certification satisfied the certification requirement of the Contract Disputes Act. This court has jurisdiction to entertain plaintiff's claim.

### Summary Judgment

In the absence of genuine issues of material fact, RUSCC 56 authorizes this court to resolve cases as matters of law. *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144 (Fed.Cir.1983). Both parties in this case have asserted the absence of any

---

**2.** *In its response to defendant's Interrogatory No. 4, plaintiff stated:*

> From 1984 to the Present, Tod Hannemann was WECI's [Western Empire Constructors, Inc.] Project Manager and a Senior Company Official in charge of the VA Medical Center Project. He was authorized to act on behalf of WECI in all matters relating to the Project, including the authority to sign on behalf of the company documents necessary to convey cost and scheduling impact information for changes in the work to the Veterans Administration.

Plaintiff's Appendix of Documentary Evidence, filed Nov. 25, 1988, at 172.

genuine issue of material fact. The Supreme Court counseled:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed to secure the just, speedy and inexpensive determination of every action.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This court concurs that summary judgment is proper for this case and therefore grants judgment as a matter of law.

### Contract Interpretation

■ The court must first look to the contract to determine the liability issue. This court must interpret the contract as a whole, leaving no part or provision meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985); *SCM Corp. v. United States*, 230 Ct.Cl. 199, 675 F.2d 280 (1982). When interpreting a contract, this court must determine the original intent of the parties. *Firestone Tire & Rubber v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). This court may interpret the contract from the perspective of a reasonable and prudent contractor. *Grimberg Co. v. United States*, 7 Cl.Ct. 452, 456, *aff'd mem.*, 785 F.2d 325 (Fed.Cir.1985); *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 917 (Fed.Cir.1984).

■ Plaintiff assumed that some "S" symbols on the drawings referred to existing boxes. Plaintiff further assumed that the existing switches were already at 40″. Plaintiff feels that the contract provided it with inadequate notice of its obligation to lower 1,262 switches. Plaintiff also argues that VA did not indicate anywhere in the contract that the existing switches were located at anything but 40″.

Read as a whole, the contract provided plaintiff with adequate notice of the requirement to lower existing switch boxes in the remodelled area to 40″ above the floor. The Demolition Notes provided the notice of plaintiff's duty to lower the switch boxes. These provisions set forth the work on the existing lighting wall switches and their switch boxes:

> Existing lighting wall switches shall be removed, *their switch boxes relocated as necessary & required by the drawings &* new 120/277 volt wall switches installed.

Def. Br. at 8 (emphasis added). In conjunction with other contract terms, this language sets forth plaintiff's duty.

The first and last clauses of Demolition Note 2 required plaintiff to remove old switches and replace them with new 120/277 volt equipment. Other contract provisions as well underscore plaintiff's duty to replace the old switches with new 120/277 volt equipment. Under the heading "GS–1 Statement of Bid Items," the contract states:

> A. Item I, GENERAL CONSTRUCTION: Work includes general construction, alterations, roads, walks, grading, drainage, *replacement* of *all* existing windows, mechanical and *electrical work*
> . . . .

Contract, Def.Br., App. at 6 (emphasis added). This language did not exclude the remodelled area.

The central clause of Demolition Note 2 required plaintiff to relocate the entire switch box as shown on the drawings. The contract drawings used the abbreviation "S" to indicate the required locations of all switches within the project. The contract explicitly referred to existing switch boxes in the remodelled area. The word "their" modifying "switch boxes" in Demolition Note 2 identified these boxes as linked to the "existing lighting wall switches."

The contract required relocation of these existing boxes according to the contract drawings. The drawings identified each switch box with the designation "S". The legend for the drawings explicitly stated that "S" denoted a switch box 40″ above the finished floor. Thus, the contract required relocation of all existing switch boxes to a point 40″ above the finished floor.

Another contract provision also emphasized plaintiff's duty to follow the drawings:

> 800–1  GENERAL:

A. Furnish and install all electrical wiring, systems equipment and accessories in accordance with the specifications and drawings. Specifications and drawings are complimentary [sic] except that, in case of conflict, specifications will govern.

Contract, Def.Br., App. at 7. Read together, these clauses underscore that plaintiff had to locate new electrical equipment in accordance with the drawings.

The contract required relocation "as necessary & required by the drawings." The word "relocated" communicates well plaintiff's obligation to lower existing switch boxes. "Relocate" means to locate again, to establish or lay out in a new place, to move to a new location. *Webster's New Collegiate Dictionary* 977 (8th ed.1975). The "new location" required by the contract drawings was 40″ above the floor. These contract terms clarify that plaintiff agreed to install electrical boxes at a 40″ height each place "S" appeared on the drawings.

### Ambiguity

■ Ambiguity exists only if there is reasonable uncertainty about the meaning of the contract's language. *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 315, 427 F.2d 722, 725 (1970) (quoting *Bishop Eng'g Co. v. United States*, 180 Ct.Cl. 411, 416 (1967)). Read as a whole, this contract is not ambiguous. Plaintiff, however, perceived ambiguity in two words of Demolition Note 2. This language reads:

[T]heir switch boxes relocated *as necessary & required by the drawings....*

Contract, Def.Br., at App. 8 (emphasis added). Plaintiff argues that the words "as necessary" are superfluous if the contract required relocation of all existing switches. According to plaintiff, these two words create the impression that the contract might not require relocation of all switches.

To the contrary, the words "as necessary" and "required" are both part of a phrase containing the words "by the drawings." Thus, the drawings define what work is necessary and what work is required. "Necessary" and "required" each refer plaintiff to the drawings. The drawings designated the location of each switch box on the wall and the height above the floor. Although redundant, the contract's use of both "necessary" and "required" underscored the need to consult and follow the drawings.

■ To the extent that the words "as necessary" create an ambiguity, the discrepancy is patent. One thousand two hundred sixty two switch boxes and a relocation project valued at nearly half a million dollars constitutes a sizable share of the electrical work on this contract. Moreover, plaintiff had the chance to inspect the remodelling project site before bids. Plaintiff's reading of the words "as necessary" also conflicts with much contract language requiring replacement of all electrical equipment and installation of all "S"s at 40″ above the finished floor. In this context, plaintiff's reading created a glaring inconsistency. Plaintiff therefore had a duty of inquiry.

In the face of any patent or glaring ambiguity, plaintiff had an affirmative duty to seek clarification before submitting its bid. *WPC Enters., Inc. v. United States*, 163 Ct.Cl. 1, 13, 323 F.2d 874, 877 (1964); *Enrico Roman, Inc. v. United States*, 2 Cl.Ct. 104, 107 (1983). Because plaintiff did not clarify any patent ambiguity, it forfeited the opportunity to rely on its unilateral interpretation of the contract. *Newsom v. United States*, 230 Ct.Cl. 301, 303, 676 F.2d 647, 649 (1982).

### Superior Knowledge

■ Plaintiff also contends that the VA had an obligation to reveal superior knowledge of the need to lower existing switches. The VA had an affirmative duty to reveal to the bidder knowledge of novel matters not revealed in the specifications which the bidder could not be reasonably expected to know. *Helene Curtis Indus. v. United States*, 160 Ct.Cl. 437, 444, 312 F.2d 774, 778 (1963). In this instance, however, the VA possessed no such special knowledge. General bidders are required to do their own investigation prior to submitting their bids. *Shayne Bros., Inc. v. United States*, 137 F.Supp. 433, 134 Ct.Cl. 154, 156–57 (1956). Plaintiff and its sub-

contractors had an opportunity to inspect the hospital before submitting bids. Plaintiff could have ascertained the height of the existing switches through visual inspection. A prudent contractor would not have overlooked that opportunity.

Plaintiff also had the contract drawings that showed the location of all relocated boxes at 40″ above the finished floor. Plaintiff, after inspecting the hospital and the contract drawings, should have known that its duties included lowering the existing switches. The VA therefore had no affirmative duty to reaffirm what the contract clearly revealed.

## CONCLUSION

The contract obligated plaintiff to lower the existing switches to 40″ above the floor. To the extent that the contract contains any ambiguities, those inconsistencies are patent and glaring. Plaintiff therefore had a duty to inquire before entering into the contract with the VA. Plaintiff did not inquire and may not now evade the terms of the contract. Accordingly, on the basis of both contract interpretation and ambiguity analysis, this court grants defendant's motion for summary judgment and denies plaintiff's motion. The Clerk of the Court is directed to enter judgment dismissing plaintiff's complaint.

No costs.